RELF (Case No. 11,692)  [20 Fed. Cas. page 522]

## Case No. 11,692.

RELF et al. v. The MARIA.

[1 Pet. Adm. 186.] [1]

District Court, D. Pennsylvania. 1805.

SEAMEN — WAGES — FORFEITURE — CRUELTY — AGREEMENT TO WAIVE WAGES—FREIGHT.

1. Mutinous and rebellious conduct of the mariners, if persisted in, forfeits their right to wages.

[Cited in Hutchinson v. Coombs. Case No. 6,-955; The Maria, Id. 9.074.]

[2. Cited in The Nimrod. Case No. 10,267, and in The Mentor, Id. 9.427. to the point that where mariners have been guilty of misconduct. and subsequently repent, and tender amends, the court will mitigate the forfeiture in whole or in part, at its discretion.]

3. Seamen must not interfere when officers of ship confine. or punish one of the crew for disorderly conduct.

[Cited in Fuller v. Colby, Case No. 5,149.]

4. When seamen are compelled to leave the ship by cruelty and oppression, wages are recoverable, and have been decreed in this court.

[Cited in Sherwood v. McIntosh. Case No. 12,-778; The America. Id. 286: Butler v. McLellan. Id. 2.242: Fuller v. Colby, Id. 5.149; Summervill v. The Francisco, Id. 13.171.]

5. Forfeitures by seamen, to what they extend.

[6. An agreement by seamen that they will claim no wages unless the ship return home and deliver her cargo. is void. Per Winchester, District Judge, note.]

[7. Freight gained and put on shore in the course of the voyage is saved from a subsequent shipwreck. It goes into the common stock; but, like the savings from a wreck. is to the last nail or cable, hypothecated to the wages. Per Winchester, District Judge, note.]

[Cited in The Saratoga, Case No. 12,355; The Two Catherines, Id. 14.288; Lewis v. The Elizabeth & Jane, Id. 8.321; Poland v. The Spartan. Id. 11.246: Sheppard v. Taylor. 5 Pet. (30 U. S.) 703, 710; Brown v. Lull, Case No. 2,018; The Niphon's Crew. Id. 10,277.]

The question principally turned on the case of Relf, the owners having settled with the whole. or greater part of the crew, the complainant Relf excepted. It appears that the ship had been armed, in the port of Philadelphia, with twelve guns; before congress had passed any law on the subject. There were on board five officers, and forty-two men. The shipping articles were lost; but it appeared in testimony, that the vessel was cleared out for the West Indies, generally; and the voyage was originally intended to be for St. Domingo. and back to Philadelphia. In February last, one of the crew, having been frequently before intoxicated, and very much so at that time, was called aft by the mate, then in command, at a port of St. Domingo, in possession of the blacks, to be interrogated as to the place where he procured liquor. It appeared that a cask of wine in the hold had been broached. He refused to inform; and the mate called the second officer to bring the irons that the

man, Manuel Peter, might be shackled, until he gave the information required. The rest of the crew, with Relf at their head, then came aft in a body. Relf was the leader and spokesman. He declared that no man should be suffered to be put in irons, while he was on board of the ship. The mate desisted. and sent on shore for the captain, who shortly after came on board, and put Peter in charge of two sentinels. All the other seamen, on Peter being confined. again came aft, Relf continuing to be their spokesman, and declared that the man should not be punished. or put in irons while drunk; but they would confine him themselves, until he was sober; and some of them demanded the irons, which were refused. The captain called for arms. though none were brought. but the second mate locked the arm chest. and retained the key. Relf, who still was the leader, directed the men to go forward. get their pistols and arm themselves. They went forward, broke up the fore grating, and furnished themselves with handspikes and clubs, but it does not appear they had pistols. One of the men was disinclined to join them, and he was wounded by some of the rest, by a severe blow on the head. They came aft again—Relf told the captain, that Peter should be released. or they would take him by force. During this scene, Peter escaped from the guard, and mixed with the rest of the crew, with whom he remained during that night. In effect, Peter was rescued by intimidation. The next morning Relf was taken out of the ship, and imprisoned on shore. He remained ten or twelve days, and came, by permission, again into the service of the ship, on shore, by assisting in a store. The mate, wanting him to overhaul the rigging, he came on board, but was unable for three weeks to do duty owing to a venereal complaint. He continued, through all the course of his conduct to be refractory, and shewed no signs of repentance; on the contrary, frequently declared "no person should be put in irons; and that he would knock down the first man that fired on a French privateer." Also, that he would. "if they met with a British frigate, get as many of the hands pressed as he could." In consequence of such threats and refractory conduct, he was again imprisoned and finally left on shore. He offered to return in the ship when she was on her way home, but the captain refused; and Relf arrived in this port in another. vessel. It appeared that the greater part of the crew were rebellious; and willingly joined in Relf's mutinous attempts; but being considered by the owners as misled, were forgiven and paid. The claim to wages for the voyage was insisted on, for many alleged reasons. One the most cogent was, that when Relf had been again received on board, he was, by accepting a continuance of his services, reinstated in his claims, and pardoned for his offences.

[1] [Reported by Richard Peters, Jr.. Esq.]

BY THE COURT. Many observations have been made not applicable to the true point of this case. I will not determine, in this indirect way, any thing respecting the voyage in which this vessel was engaged, as to its lawfulness or impropriety: nor will I decide how far the crew were bound to obey any orders, which might have been given for defence, against attacks by belligerent cruizers. They had no right to suppose, or anticipate, that such orders would be given. When such questions come directly before me, and I find it necessary to decide them, I will meet and determine them, without hesitation, so far as my duty and judgment permit and enable me.

The sole question now is, "Was there or was there not, a lawful cause for ejecting Relf from the ship?" If Relf has any cause of action for false imprisonment, or cruelty of treatment, for which damages are sought, he must go before another tribunal; so must it be with Manuel Peter, who seems however to have acquiesced; and I hear of no charge from him. Seamen ought to know that it does not lay with them, to interfere between the officers of a ship and any mariner they (the officers or any of them in command) choose to confine, or punish for disorderly conduct. If it is done immoderately, the law affords redress to the party injured. Instead of interfering to prevent, they are bound to assist the master to constrain, imprison, and bring to justice, any disobedient, mutinous and rebéllious mariner. When any charge of a criminal nature is alleged, I am, and always have been, ready to examine into it, and pursue the proper measures. The officers of ships are amenable for improper conduct: but if they are not supported in the lawful exercise of their authority, there will be an end of all discipline, and no vessel will with security navigate the ocean. I am always inclined to support their authority, though I have been too frequently called on to protect seamen against their oppression. A case in Espinasse, determined in the king's bench, in England, is produced to shew that a seaman is justifiable in leaving a ship, if obliged so to do, by continued cruelty and oppression. I have, under the clear and direct injunctions of the maritime laws, and in the spirit of that case, often compelled the payment of wages for the voyage, when such circumstances were in proof. But it does not apply in this case. I am of opinion here, that the captain was justifiable in discharging the mariner Relf, and refusing to receive him on board again. It is true that a mariner having committed a fault, and repenting, must be again received on board, on tender of amends. These amends cannot exceed what the law contemplates to be forfeited, where forfeiture is inflicted, i. e. his wages and property on board. Beyond these a sailor has nothing. "Lex non cogit ad impossibilia." If he offers himself, or returns to duty, it must be on tender of reasonable amends. If he be received on the motion of the captain, or without terms, he is reinstated in his claims, and pardoned for his offences. But in every experiment, Relf shewed every sign of a continued, refractory, dangerous and mutinous temper; and not one of repentance and amendment; he was therefore lawfully discharged;—the safety and peace of the ship required it. It was in the option of the captain to forgive other offenders, and continue to reject the services of Relf: and to refuse payment of wages after the time of his being ejected from the duty of the ship. The wages due before that time must be paid, deducting any payments or legal set off, claimed by the captain or owners. This is not a forfeiture of all wages or property of the sailor on board, but a legal cause to refuse payment after his discharge, though the claim is for the wages during the voyage, which I am in the habit of decreeing, where no lawful cause for discharge appears. There are authorities which go the length of forfeiting all wages due, in very aggravated cases, where no compromise or re-acceptance of service has occurred. In the case before me I should not have hesitated to determine that Relf was forgiven and reinstated in his claims, by being received on board after his first atrocious misbehaviour. But his subsequent continuance in the rebellious and highly dangerous spirit which prompted his former misconduct, evidences his not having returned to the ship on the terms the law requires, to wit, repentance and amendment. Whatever effect the re-acceptance of service may have to the time he re-entered on board, the subsequent misbehaviour evidences the mala mens, and justifies his expulsion from the ship.

NOTE. The following notes of the decisions of James Winchester. Esq., have been received too late for an insertion in an early part of this work, and in connection with cases involving the same points. They, with others which will be included in these Reports, will be found worthy of the attention of every lawyer, and will be received as new proof, of the genius and learning of the late judge of the Maryland district:

1. Seaman's wages are due by the custom of merchants at every delivering port.

2. Wherever freight is earned wages are also earned. And as a consequence of this rule,

3. If the vessel be lost before her arrival at a delivering port the wages are nevertheless earned if the freight be advanced.—2 Show. 283.

4. Any agreement of the owners by which the freight of the outward voyage is made to depend on the accomplishment of the inward voyage will not affect the seamen without their privity.—Abb. Shipp. 276.

5. It is doubtful whether with their privity such a stipulation is not void as to sailors.—Edwards v. Child. 2 Vern. 727.

By the law of the United States, seamen are entitled to one-third part of their wages at every delivering port, unless the contrary be stipulated. It has been usual to insert a clause in sailor's articles "that no wages shall be due or claimed until the return of the ship to

her home, and the cargo or ballast delivered." See the case of Giles v. The Cynthia [Case No. 5,424]. It is contended by the ship owners, that upon the true construction of this clause seamen lose all claim to wages in the event of a loss on the homeward voyage. On the behalf of the seamen it is insisted, that this clause only applies to wages dependent on the homeward voyage, and does not relate to wages antecedently earned. On the first view of this clause, the construction which presents itself as most consistent with the law of the United States, and the justice of the case, is, that the parties could only intend it to apply to the time and place in which the wages should be legally demandable. As such it is a stipulation conformable to maritime usage, and those considerations of general policy which are involved in maritime questions The owners are protected from libels in foreign ports, and their freight constitutes an additional capital, from whence further profits may arise. The seamen's wages, instead of being dissipated in foreign ports, accumulate for the benefit of their families, and the sailors themselves have additional ties which secure their return to their own country. See the case from Maline, cited in Abb. Shipp. 196. As the latitude of the words used in sailor's articles, authorize this construction, and it is equally favored by justice and policy; it is one to which the court will lean as most consistent with the interest of the parties. But where the clause is so framed as to preclude all construction, and the intent of the parties is plainly expressed, the only question for consideration is the legality of such a stipulation. In most cases, however, it is necessary to decide what is a delivering port, to ascertain whether any wages were earned, to be forfeited by virtue of this claim, supposing it legal and valid. This inquiry is of considerable importance and not without difficulty.

The law of the United States contemplates two species of contract between owners and seamen—1. For a voyage or voyages. 2. For a term or terms of time. The term voyage is a technical phrase, and always imports a definitive commencement and end "nomen loci ubi navis oneratur et nomen loci quo navis tendit." A voyage may terminate upon arrival at a specified port, but it may likewise comprehend a number of ports or places. The right to recover freight, is not therefore on one hand absolute upon the arrival at a port or place of safety during the prosecution of a voyage, nor on the other hand is all claim to freight necessarily lost in consequence of the loss of the vessel before her arrival at all the ports contemplated for the voyage. This must depend on the nature of the trade and circumstances of each particular case, as well as the general maritime law. The right of the seamen to wages is so ultimately connected with the right of the owners to freight, that the solution of one, is upon general principles of law, a solution of the other. By the custom of merchants, freight is due at every delivering port, that is, at every port where an outward cargo shall be delivered in safety, as is well explained in Luke v. Lyde, 2 Burrows, 882, 1 W. Bl. 190. This explanation requires attention, since it is not the act of delivering the cargo only, but the circumstance of the delivery of the cargo at the specified port, which is a termination of the voyage, pro hac. If the parties stipulate, that the vessel shall proceed to A to receive a cargo, and go from thence to B, and unlade the same, and receive on board another, with which to proceed to C.— Upon the arrival and delivery of which last cargo at C, a certain freight shall be paid and not otherwise, the voyage does not terminate until the arrival at C, nor are A and B ports of delivery at which freight is earned. But as this construction arises from the agreement of the owners and freighters, it can in no wise influence the right of the seamen, relatively to whom the agreement has no operation. The owners, as to themselves, are competent to re-

linquish the benefit of the general rule of law, but as to the seamen who have not relinquished the benefit of the general rule of law, every port where an outward cargo is unloaded is as to them a port of delivery, and wages to that time are earned. The owners would also in such case have been entitled to freight, if it had not been for their agreement; and the general rule of law operates in favour of the seamen: they are in no wise affected, if the loss of the freight results from the agreement, or the fault of the owner.

In an agreement, by seamen, that their wages shall depend upon the earning of the freight, conformably to the engagement, with the freighter there is nothing inconsistent with the provisions of the statute for the'r regulation and government. It is competent to them to connect their right of wages with the owners' right to freight upon a voyage, comprising more than one port. "Quia viaggium, vel navigatio, cum sit nomen juris, ac universale, potest complecti plura itinera explenda tam in itu, quam in reditu, pro oneratione, et respective exoneratione mercium, quas navis, plurimorum, ac varii generis defert in pluribus emporüs vel locis facienda." 2 Emer. 19; Cassaregis disc. 67, note 28. The admission of the validity of this sort of agreement is predicated upon the fairness of the transaction, and a full and fair disclosure, by the owners, to the seamen. It may also happen that, from the usage of trade, seamen s wages should not be considered as earned until the vessel return home. In France there is a trade denominated la caravane, which is a multiplicity of little voyages, wnich a captain makes, in the course of his navigation. These divers little voyages, taken cumulatively, form but one single and principal voyage; the freight gained in the course of the caravane defray the expenses of the navigation, and the nett proceeds on the return home are divided amongst the interested. This exception founded on particular usage, strongly confirms the general rule. The legality of even this sort of agreement derogating from the general maritime law was denied in the case of Edwards v. Child, 2 Vern. 727, in which it is said a similar decision was made by Lord Chief Justice Holt. It is true, the authority of this case has since been questioned, and may be considered as overruled, so far as it restrains agreements by which wages are made to depend on the earning freight, agreeably to the contract of affreightment, but no farther; for the very ground on which its authority is denied, is the fact which appeared in the cause, that the seamen had received their share of the imprest money, which was all that had been received by the ship owners or captain.

To decide upon the validity of a clause by which wages are forfeited to the owners although the freight has been received by them, let us enquire into the reasons by which the general maritime law is supported, and the nature of the relationship between the owners and mariners. Wages are not due where the vessel is wrecked, or freight not earned or received. The right to wages is made to depend upon the completion of the voyage for securing the fidelity of the seamen; their interest is connected with their duty, and the vessel and freight become specifically bound for the payment of their wages. Public interest also requires that the fate of the seamen should be connected with that of the vessel. The contract of the sailors is a species of co-partnership between them and the owners. If all is lost, the sailors lose their wages; but if all is not lost, that which remains of ship and freight, is a common property pledged for the payment of wages. Freight gained and put on shore in the course of the voyage, is saved from a subsequent shipwreck. It goes into the common stock; but, like the savings from a wreck, is to the last nail or cable, hypothecated to the wages. Even after an abandonment to underwriters, it is still pledged in their hands to the sailors. So also in the case of capture and re-capture, because the ship on

her arrival was entitled to freight; the wages were adjudged payable by Lord Eldon. Abb. Shipp. 196. The freight thus earned and received, constitutes a common stock, and in the hands of the owners is a trust fund to be accounted for to those whose industry produced it. A clause by which it shall be stipulated that he who bears the labour and hazard of acquiring this common stock, shall bear all the loss, and not participate even in the wreck of profit, is not consistent with any just notion of co-partnership or common interest. It is wholly incompatible, therefore, with every idea of a trust, to permit one of the parties to eat up the whole estate, and as an agreement to grant or cede it, is destitute of all actual, as well as moral or equitable consideration. It is a nude pact. It is, in its very nature, fraudulent as to one of the parties; and with a view to public policy equally reprehensible from its tendency to separate the interest from the duty of sailors, and induce them to repair by embezzlement the loss which such an agreement subjects them to. I am therefore of opinion, that the only legal effect of such a stipulation is to preclude the seamen from libelling in foreign ports, until the vessel return, or the voyage be ended; that it is invalid to produce a forfeiture of wages; and that upon the solid principles of law and policy, freight must always be considered the mother of wages, and, notwithstanding any agreement to the contrary, where the former is earned, the latter must be paid.