Jackson, J.
We will first consider what sum the plaintiffs are entitled to recover on this charter-party; and, secondly, what deductions are to be made from that sum, according to the agreement of the parties, for the expenses claimed by the defendants as a general average.
As to the first, the charter-party is in the common form; the defendants undertaking to victual and man the ship, and to pay three dollars a ton per month, so long as she should be continued in their service, in the voyage described in the charter-party. The natural and obvious construction of this covenant would be, that the defendants should pay, at the rate agreed on, from the time when they received the ship, until they returned her to the plaintiffs, after the termination of the voyage.
It is not therefore sufficient to say, that there is no case in which such a claim has been expressly allowed in a court of law, under circumstances like the present. It must prevail, unless opposed by some established principle relating to this species of contract, or unless the words of the covenant have, by mercantile usage, received a practical construction, different from that above suggested. We are not aware of any such mercantile usage or understanding, and none such has been proved. No case has been cited in which a claim like the present has been disallowed in any court of common law.
Abbot (part 3, c. 7, § 1, 3) expresses a doubt whether the hire on such a charter-party would be payable, in case of a capture and. recapture, for the period of detention ; and in 3 Caines’s Reports, 158; Livingston, J., intimates a similar doubt, in case of a detention by an embargo in a foreign port. On the other hand, * it was decided by this Court, in the case of Minot & Al. Adms. vs. Durant, (7) that the hirer was liable, on such a charter-party, for all the time the vessel was detained in our own ports by an embargo laid by the government of the United States; and in the case of Havelock vs. Geddes & Al., cited in the argument, the hirer was held liable, in like manner, for the time consumed during the voyage in making necessary repairs on the ship. In Molloy, (b. 2, c. 4, § 13,) it is expressly stated, that the contract of affreightment is nol *66 determined or dissolved by a capture and recapture, but remains after the recapture, as if the ship had never been taken ; and in Beale vs. Thompson (8) the Court of King’s Bench expressed an opinion that, in case of a hostile seizure or capture, if the ship is afterwards restored by the capturing power, which is the case at bar, the wages of1 seamen hired by the month are not stopped during the detention. From the strong analogy between seamen’s wages and freight, it may be supposed that that court would have decided in the same manner on a contract for the hire of a ship payable by the month.
The weight of authority, therefore, as far as any has been adduced, may be considered as in favor of the plaintiffs. It is indeed surprising that nothing more decisive has been found, on this point, in the books of the common law; but it would appear to us"still more surprising, if a claim, like that of the plaintiffs in this case, had ever been rejected.
The defendants, by virtue of this charter-party, became the owners of the ship for the voyage, or for the time stipulated in the contract. They might load her themselves, or take freight for others, on such terms as they should think proper. The whole earnings of the ship, in either case, were for their use. If she should perform her voyage in a short time, the gain would be theirs. They would have the same benefit, whether as.freight on their own goods or on the goods of others, as if the voyage had been unusually prolonged; whilst * the expenses of wages and provisions, which were to be paid by them, would be reduced. On the other hand, if the voyage should be delayed by adverse winds, or by any other of the common casualties or occurrences, the defendants would sustain the whole loss arising from that circumstance. They would be held to pay the increased hire and expenses of the ship and the crew, whilst their freight or profits from the voyage would remain the same.
The plaintiffs had sold their ship for the time to the defendants, to be used in any manner not inconsistent with the contract; and as they could gain nothing, so ought they not to lose, in consequence of the particular manner in which she should be employed by the defendants. If the plaintiffs had not thus parted with their ship, they might have taken freight, or employed her in some voyage on their own account; and if it be said that the voyage might still have been prolonged by the same or the like accidents that have now occurred, the answer is, that the owners, in that case, would have had the chance of a short and profitable voyage to compensate the risk of *67 such a delay or detention. Suppose the owners had let their ship for a certain term of years, without designating any voyage or voyages in which she should be employed; they would certainly be entitled to the hire for the whole time, although the ship should remain in port the whole time, in consequence of an embargo, from not finding suitable employment, from fear of capture by an enemy, or any other similar cause.
The application of these principles has never been doubted, when the ship has been driven out of her course by a tempest, or delayed by adverse winds ; and they have been applied, as before mentioned, when she has been detained by an embargo. We can perceive no diEerence, as it regards this question, between a delay arising from any of those causes, and that which has occurred in the present case.
Here was a hostile seizure of the ship. This might * have been followed by a condemnation as prize, which would undoubtedly have dissolved the contract of affreightment ; but in the events which have happened, it produced only a prolongation of the voyage. The ship was restored by the sovereign under whose authority she was seized. The captors therefore admit that they had no right to condemn the property, or to deal with it as captured.
It makes no diEerence, that the ship was carried into a port ot the captors for examination before she was restored. If this seizure produced a dissolution- of the charter-party, the same consequence would follow, however short might be the period of the detention, and whether she were restored by the captors upon examination of her papers at sea. or upon a like examination in port, or in a Court of Admiralty.
We must not confound this contract with that contained in a policy of insurance. The assured may, during such a detention, abandon the ship to the insurers, and recover as for a total loss; because the insurers have agreed that, in case of such an interrup tian of his voyage, whilst it is uncertain how soon it can be resumed, or whether it can ever be further prosecuted, he may disembarrass himself of the adventure, and that they will pay him for the ship, and take the future risks upon themselves. But the owner of the ship makes no such contract with the hirer, in a common charter-party of aEreightment. He is to be paid for the whole time the ship is out of his possession, in virtue of the contract, whether her voyage be long or short, and by whatever accident she may be delayed; provided the delay do not arise from his own default; and provided also that the voyage be finally completed.
We are therefore of opinion that the plaintiffs in this case are *68 entitled to the hire, as stipulated by the charter-party, without any deduction for the time the ship was detained in consequence of the capture or seizure by the British cruiser.
We are next to consider the claims of the defendants *for contribution, for sundry expenses incurred by them as a general average ; which, so far as they are allowable, are, by the agreement of the parties, to be deducted from the sum due to the plaintiffs.
The necessary costs and charges, incurred and paid by the defendants in reclaiming and procuring the restoration of the ship and cargo, are undoubtedly to be allowed as a general average ; and when the amount is ascertained in the manner agreed by the parties, it must be apportioned, as usual, on the ship, cargo, and freight. The sum which may thus be found due from the plaintiffs, will be deducted from that which is due to them on the charter-party.
As to the wages and provisions of the crew during the detention, we are unable, notwithstanding the very respectable authorities cited in support of this claim, to see any ground on which we can allow it, consistently with the established principles on this subject, and the course of decisions in this state.
The only case in which this charge has been allowed, in an account of a general average, in our courts, was where it was necessary to go into port, to repair damages sustained during the voyage from the perils of the sea; and the master, for that reason, voluntarily sought a port to refit. (8) Here, it is to be observed, the delay was voluntarily incurred by the master; the mind and agency of man were employed in producing it; and this circumstance is deemed essential in every case of general average, in contradistinction to such unavoidable detentions and losses, as arise from accident beyond the control of the master.
We see no ground of distinction, in this respect, between a temporary detention, occasioned by a hostile seizure, and one which is occasioned by an embargo, or by a tempest, or other common peril of the sea. If, upon such a seizure, the contract for wages were dissolved, and the mariners discharged from all further duty on board the ship, and if they afterwards remained under a new contract with the master, express or implied, to assist in reclaiming the ship and cargo for * the respective owners, the compensation due to them for that service would be justly brought into an account of general average. It would then be an expense voluntarily incurred by the master, for the benefit of all concerned in the adventure. It is upon this ground, that the *69 wages and provisions of the crew, in such a case, have been allowed as general average in the Supreme Court of the state of New York; (9) but it is said by the same Court, that if the service for which contribution is claimed results from a previous obligation on the party rendering it, or is the effect of a previous stipulation or contract, the compensation for that service is not to be defrayed in this manner. (10) Now, we apprehend that the contract of the mariners is not necessarily dissolved by such a capture. If it were so." it is hot easy to see why the same consequence would not follow, as to this contract, which we before mentioned with respect to a charter-party ; and a mere seizure by a ship of war, and an examination of the papers at sea, would exonerate the mariners from their obligations to the master.
But without relying on this extreme case, the operation of this principle, after the ship had been carried into port for adjudication, would often prove highly injurious to the interests of commerce. Suppose a belligerent cruiser, from ignorance or cupidity, should seize and send into port a neutral ship, against which there was no just ground of complaint or suspicion; and that the ship, on her arrival in port, should be immediately restored to the master; if she had not been sent far out of her course, this might prove only a short and unimportant delay of her voyage. But if all the preexisting contracts relating to the voyage are absolutely at an end; if the mariners may lawfully desert the ship; or if the master, on his part, may dismiss the crew, and consider his charter-party annulled and his voyage determined, and may proceed, as in case of a shipwreck, to sell or dispose of the whole property, — the consequence would often be a total loss and destruction of the voyage.
* This would put it in the power of the master to termínate the voyage at his pleasure, and to charge the insurers for a total loss, if he should find the markets were bad at his port of destination, and that the adventure was likely to prove unprofitable; and if, on the other hand, the prospects were favorable, and he should desire to prosecute the voyage, it might be defeated by the refusal of the mariners to proceed, if it should happen in a port where he could not procure another crew'. If it should be thought that the rule would not apply, when the ship was thus early restored to the master, and that it is only after a libel in a Court of Admiralty that the contracts for freight and wages are dissolved, — we answer, that there is no reason for stopping at that point; and that, if the contracts in question are not dissolved until *70 proceedings against the ship are commenced in a Court of Admi ralty, they ought not to be dissolved until the capture is consummated by a condemnation.
If the services of the mariners, after such a capture of the ship, are upon a new implied contract, it is a little singular that their compensation should depend, not on the nature and the value of the services thus rendered, but on the accidental circumstances of the duration of the voyage before the capture. Yet this is the rule universally adopted, in ascertaining the quantum meruit for those services upon this supposed new contract. If the ship should be condemned, they would lose all their wages from the last port of delivery ; but if she is restored, they receive their whole wages until the termination of the voyage. Now, their services after the capture would be equally useful and meritorious, whether the ship had been in the prosecution of her voyage one week, or one year, before the capture. So, if the mariners should desert the ship immediately after a capture, they would most certainly lose their wages, even though she should afterwards be restored and perform her voyage. If, then, they are entitled to their whole wages, by remaining with the ship and finally completing the voyage, the amount received * by them is paid wholly for their services after the capture ; and the whole sum paid, down to the time' of the restoration of the ship, ought therefore to be brought into the general average, unless it is paid upon the principle which we adopt, that is, upon the original contract between the master and the mariners. Yet it has not been pretended, in this case, that any sum due for wages before the capture ought to be included in the general average; and we believe the claim has never, in any case, been carried to that length.
It may be added, that, if the sums thus due to the mariners are considered solely as compensation for their voluntary services in reclaiming the ship, and not as wages for their services as mariners, it ought to be paid to them in all events, whether the voyage be finally performed or not. Their claim would rest on the same footing as that of any other agents, or persons employed in procuring the restoration of the property. Yet no distinction is ever made, in this respect, between the sum payable to the mariners on this account and that which is due on their contract for wages; and if the ship, after her restoration, should be lost by the common perils of the sea; before completing her voyage, it has never been doubted that the mariners would lose their whole compensation from the last port of delivery, including the period of detention, as well as the other part of the voyage.
It might be sufficient for us, in considering this question, to refei *71 to the case of Brooks vs. Dorr & Al., (11) in which it was expressly decided by this Court, that the capture of a ship, which was after-wards restored to the master, did not dissolve the contract for wages, and that a mariner was entitled to recover on that contract, although he was taken out of the ship at the time of the capture, and did not afterwards perform any service on board of her. The same principle, although it has been sometimes questioned, is supported by many very respectable authorities. It was adopted by Lord Kenyon in the case of Pratt vs. Cuff, cited in 4 East, 43, by Lord Eldon in the case of Bergstrom vs. Mills, 3 * Esp. N. P. Cases, 36, by the whole Court of King’s Bench in the case of Beale vs. Thompson, and in sundry cases in the Courts of the United States for the district of Pennsylvania.
We are aware of the inconvenience which might be suffered, on the one hand, by the owners, if the master should be required to maintain his whole crew in a foreign port .during a long course of admiralty proceedings, and after he had wholly despaired of regaining the possession of his ship ; and, on the other hand, by the mariners, if they should be compelled to remain with the ship, after all hopes of her restoration were abandoned, and with the certainty of losing their whole wages in case of her condemnation.
But these consequences would not perhaps necessarily follow from the principles we assume. It may often promote the convenience of all parties, and the interests of commerce, that the mariners should be discharged, when it is known that the proceedings in the Admiralty Court will be protracted to an unusual length of time, and when it appears probable that the ship will be condemned. But if it should be decided that, in such a case, the mariners have a right to be discharged, upon relinquishing all claims to wages for the preceding part of the voyage ; or that a master has-a right to discharge them, upon paying the amount of wages due up to that time; still it would not follow that the contract for the service and wages was absolutely dissolved by the capture, against the will of both parties. We give no opinion on that point at present; because we apprehend that, even if the master and mariners had respectively the right mentioned, yet, if the mariners do, with the assent of the master, remain on board and discharge their duty, and if, upon the restoration of the ship, they complete the voyage in her, they are entitled to their wages upon the footing of the original contract.
We have been the more particular in examining this point, because on this depends the principal question now under consider *72 ation. We are not aware of any * other ground upon which the wages and provisions of the crew, during a detention of this kind, have ever been included in a general average. It appears to us that these expenses ought to fall exclusively on the owner of the freight for the voyage, whether he is the owner, or the hirer, of the ship. It is merely an interruption or delay of the voyage which diminishes his profits. The ship owner might as well claim a contribution for the wear and tear of his ship during the detention, or the owner of the cargo for the interest of his money, for the deterioration of his merchandise, or for the loss of a market by the delay, as the owner of the freight for the extraordinary wages and provisions expended on such an occasion.
A question still remains, as to the proportion in which the respective parties are bound to contribute for the costs and expenses, which we have considered to be payable as a general average. This ought to be settled in the same manner as if the three articles liable to contribute, viz., the ship, cargo, and freight, were owned by different persons, or as if they were severally insured by different sets of underwriters. In such a case, each party would contribute according to the real value and amount of his interest, without regard to the particular contracts relating to the voyage. If, for example, the owner had agreed, in one event, to receive nothing for the carriage of the goods, in consideration of which he was to be entitled, in another event, to receive double the customary freight, still, in settling the contribution to a general average, the freight would be estimated at the customary rate for such a voyage. Again, as this contribution is claimed as a recompense for services rendered, and not a compensation for property voluntarily sacrificed for the common good, the party who performed or paid for those services was entitled to his recompense, although the ship should have been afterwards totally lost before completing her voyage.
The contribution therefore must be adjusted according to the value of the respective articles saved, at the * time when the expense was incurred; in like manner as if all the three parties had been present, and each had originally paid his own proportion.
If the contribution had been claimed for goods thrown overboard, or for a mast cut away, the adjustment of it would be necessarily postponed until the termination of the voyage; because until that event, it could not be known whether any thing would be saved, from which to claim a contribution ; and also because each party would be held to contribute according to the value of what should come to his hands at the termination of the voyage.
The value of the ship is agreed by the parties ; and as it does not *73 appear whether that estimation was made with respect to the time when she was at Gibraltar, or to the time of her return to Boston, we may presume that this circumstance would not materially vary the result. The value of the cargo is also agreed, when received on board the ship at St. TJbes. This must be taken as the value, for which the cargo should contribute, unless it should appear to the assessors that it had acquired an additional value by being carried to Gibraltar. From the relative situation of the two places, it is not probable that any such change in value took place. The price at which it was finally sold in Boston cannot affect this estimation, because the contribution would have been the same if it had never arrived there, or at any other port of delivery. The value of the freight will also be settled by the assessors, according to the customary rate of freight at that time from St. Ubes to Boston, which is agreed by the parties to be 1492 dollars, deducting from that sum the amount of the wages and provisions which would usually be expended in such a voyage; and the balance will be the net value, for which the owner of the freight must contribute.
When goods are carried on freight, the actual amount of the freight list is the best evidence, and, indeed, is generally considered conclusive, as to the gross amount of freight. But when, as in this case, the cargo is the * property of the same person who owns the ship for the voyage, so that no price is stipulated for the carriage of the goods, we know of no other mode of estimating the freight than that above mentioned. In this estimate no freight is included for any preceding voyage or passage; because that was all earned, and is presumed to have been paid, before the ship left St. Ubes. On the other hand, the estimate in eludes the freight to be earned during the remainder of the passage, from Gibraltar to Boston; because that, as well as what had been earned, if any, between St. Ubes and Gibraltar, would all have been lost, if the ship had been condemned.
This does not militate with the principle before mentioned, as to adjusting the contribution at Gibraltar, and not at Boston; because this is the true value of the interest which the owner of the freight then had in the common adventure ; this is the amount of his property at risk on that voyage. It is true that, if the ship had been afterwards lost, he would have lost his freight; and so would the ship-owner have lost his ship, and the merchant his cargo. Yet they must all contribute, according to the value at Gibraltar. The freight, as it does not depend on markets, will always be estimated at the same value, whether the estimate shall be made at the port of destination, or at any intermediate port.
For the valiie of the freight, when thus ascertained, the plaintiffs *74 alone must contribute to the general average. If the ship and cargo had been condemned at Gibraltar, the plaintiffs would have lost their whole freight for that voyage; they would have received nothing for the hire of the ship, after she left St. Ubes. And although the sum for which they are now to contribute is less than the actual amount of the hire in this case, yet that arises from the special contract which they made; and the result would be the same, if by that contract they should eventually have received nothing.
#The defendants had no interest in the freight. If the voyage had been lost by a condemnation at Gibraltar, they would have lost nothing but their cargo. They ought therefore to contribute only for the value of the cargo. They had at that time paid nothing towards the freight of their goods from St. Ubes to Boston, and were not liable to pay any thing, if the property had all been lost at Gibraltar. And as they were not the actual owners of the ship, they would not have suffered if she liad carried nothing on that voyage.
We are aware that this manner of apportioning the general average on the freight, and charging the whole of it on the plaintiffs, differs from that which was proposed by this Court in the case of Douglas vs. Moody & Al. (12) But in that case, as no general average was recoverable, the point was not necessarily involved in the determination of the cause, and probably might not receive so much consideration as if the facts had required the application of the principle. The eventual profit to the hirer, on the arrival of the ship at her port of destination, may be considered in some view as freight. But it is, in truth, only the fund out of which he pays the freight; and all that he earns above that sum is the mercantile profit' upon his adventure. And as to the sum paid as freight, he pays only after he has received it by the safe arrival of the ship; and if she never performs the voyage, he pays nothing; so that in this particular he risks nothing. It is true that the hire or freight, to be paid to the ship-owner on the arrival of the ship, may be considered in some views as his profits on the adventure, and as resembling the expected profits on the cargo ; and it is for this reason that, in some commercial codes, the freight is not considered as a vested interest or property, nor as the subject of insurance. But by our law, the freight is always treated as a distinct property, which, at the commencement of the voyage, is put into the common stock with the ship and the cargo. It is exposed to the like perils, is insurable like them ; and the owner of it is interested, * in *75 proportion to its amount, in the successful termination of the voyage. He ought therefore to contribute, in that proportion, to all the expenses and losses incurred for the common benefit

 7 Mass. Rep. 436.

 4 East, 546.

 4 Mass. Rep. 548, Padelford Al. vs. Boardman.

 1 Caines’s Rep. 573.

 2 Caines’s Rep. 267.—3 Caines, 159.

 2 Mass. Rep. 39.

 9 Mass Rep. [48.