BROWN (LAMB v.). See Case No. 8,011.

BROWN (LATHROP v.). See Case No. 8,108.

BROWN v. LENNOX. See Case No. 2,029.

BROWN (LONSDALE v.). See Cases Nos. 8,492, 8,493, 8,494 and 8,495.

## Case No. 2,018.

### BROWN et al. v. LULL.

[2 Sumn. 443.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1836.

SEAMEN—CAPTURE OF VESSEL — THE CONTRACT— DUTIES—WAGES —ADDITIONAL COMPENSATION— LIEN—PRIORITY—ADMIRALTY —EQUITY POWERS —EVIDENCE—PRESUMPTION.

1. The capture of a neutral ship does not, of itself, operate as a dissolution of the contract for mariner's wages; but at most only as a suspension of the contract.

[Cited in Boulton v. Moore, 14 Fed. 925.]

2. If the ship is restored, and performs her voyage, the contract is revived, and the mariner becomes entitled to his full wages for the whole voyage, if he has remained on board, and done his duty; or if, being taken out, he has been unable, without any fault of his own, to rejoin the ship.

3. On a sentence of condemnation against the ship, the contract is dissolved, and the mariner is discharged from any further duty on board, and also loses his wages, unless there is a subsequent restitution of the property, or of its equivalent value, with an allowance of freight.

4. In the case of a restitution in value, the proceeds represent the ship and freight, and are a substitute therefor, and subject to their liens.

5. If freight is decreed for the whole voyage, the mariner is entitled to full wages; if for only a part of the voyage, the mariner is entitled only to pro rata freight, unless under special circumstances, as where the mariner remained by the ship, at the special request of

the master, to preserve and protect the property for the benefit of all concerned.

6. It is the right and duty of the mariners of a neutral ship, after capture, to remain by the ship, while there is any hope of recovering the property: and this is generally done when there is a sentence of condemnation, and a fortiori when there is a sale thereof pending the proceedings, or under the sentence of condemnation.

7. Seamen are peculiar favorites of admiralty, and contracts between them and ship-owners are scanned with great closeness and jealousy.

[Cited in The Etna, Case No. 4,542.]

8. Courts of admiralty, so far as their powers extend, act as courts of equity.

[Cited in The David Pratt, Case No. 3,597; The Betsy and Rhoda, Id. 1,366; Weston v. Minot, Id. 17,453; Watts v. Camors, 115 U. S. 361, 6 Sup. Ct. 94; Paterson v. Dakin, 31 Fed. 683.]

[See Copp v. De Castro & Donner Sugar Refining Co., Case No. 3,215.]

9. Any stipulations in shipping articles, which derogate from the general rights and privileges of seamen, will be held void in admiralty, unless it shall appear, both that the nature and operation of the stipulation were fully explained to the seamen, and that an additional compensation was allowed entirely adequate to the new restrictions imposed thereby. And the onus probandi is on the ship-owner to establish these facts.

[Cited in The Betsy and Rhoda, Case No. 1,366; The Rajah, Id. 11,538; The Almatia, Id. 254; The San Marcos, 27 Fed. 569; The International, 30 Fed. 377.]

10. The following clause in the shipping articles was held void; viz.: "In case of the said vessel being taken or lost in the course of the said voyage, no wages shall be demanded or received by the subscriber, except the advance wages received by them respectively, at the time of entry on board; and that, if the said vessel should be restrained for more than thirty days at any one time, the wages should cease during such restraint and no longer."

11. Commissioners, upon whom the law has imposed the duty of awarding a full indemnity for certain losses, cannot be presumed to have departed from it; therefore, the compensation allowed to the owner will be presumed to be a full indemnity for his loss.

12. The lien for seamen's wages attaches to the ship and freight, and their proceeds, into whosesoever hands they may come, and takes priority of all other claims. Therefore, the ship-owners are liable, though they have received certain instalments only of the sums awarded under the treaty, and not full payment; and though a proportion of this has been paid to the underwriters, who had insured the vessel at the time of her loss.

[Cited in Taylor v. The Royal Saxon, Case No. 13,803; Fitz v. The Amelie, Id. 4,838; The Bolivar, Id. 1,610; Pitman v. Hooker, Id. 11,185; North v. The Lioness No. 2, 3 Fed. 925; Wilson v. Bell, 20 Wall. (87 U. S.) 221].

13. Lull shipped, as mariner, on board of the brig Two Betseys, on 4th September, 1809, on a voyage from Beverly to Naples, and back again, at the rate of wages of $18 per month. The brig arrived at Naples in November, 1809, and while lying there, was seized, and finally, on 12th of March, 1810, confiscated and sold. Lull continued on board of the brig until 10th of June, 1810, when he was discharged by the master, with his own consent, and sailed in another vessel for Salem, where he arrived 19th of August, 1810. By a convention with the king of the Two Sicilies, a provision was made for the indemnity of this, and other American

claims; and three instalments were received, amounting in all to more than the present claim for wages; a proportion of the indemnity went to the underwriters, who, at the time of the loss, had insured the said vessel. *Held*, that the libellant, the administrator of Lull was entitled to recover full wages from the time of Lull's shipment to the time, when he arrived in the United States.

Appeal from the district court of the United States for the district of Massachusetts.

In admiralty. This was the case of a libel in personam for seaman's wages, brought by Rebecca Lull, administratrix of Jonathan Lull, deceased, against Charles Brown and others (the respondents and appellants,) as executors of the last will and testament of Israel Thorndike. The district court made a decree [case unreported] in favor of the libellants, for the sum of $189, being the wages due to Lull from the time of his shipment in the brig Two Betseys (of which Mr. Thorndike was owner) to the time of his arrival in Salem by cartel from Naples, deducting his one month's advance wages. The present appeal was from that decree on behalf of the respondents. [Affirmed.]

The material facts were as follows: Lull shipped as a mariner on board of the brig Two Betseys (Gardner, master,) on the 4th of September, 1809, on a voyage from the port of Beverly, in this district, to Naples, in the kingdom of the Two Sicilies, and back again to Beverly, at the rate of wages of $18 per month. The brig duly arrived at Naples sometime in the month of November, 1809, and while lying there was seized and sequestered, together with her cargo, and finally, on the 12th of March, 1810, confiscated and sold by a decree of Joachim Napoleon, then king of the Two Sicilies. Lull continued to remain on board of the brig, doing duty, until the time of the confiscation (the libellant asserts until the 10th of June, 1810,) when he was discharged by the master of the brig, with his own consent, and he sailed in another vessel (a cartel) for the port of Salem, in this district, and arrived there on the 19th of August, 1810. By a convention made between the United States and the king of the Two Sicilies, at Naples, on the 14th of October, 1832, provision was made for the indemnity of American citizens (and among others, of the testator,) whose property had been sequestered and confiscated in the manner aforesaid. The commissioners under that treaty awarded $4,000 to the testator for the said brig, and $5,640 for freight, as an indemnity for his losses sustained in the premises; three instalments of which were since duly received by the respondents. In the original shipping articles (which in other respects were in the common form), there was a clause, that in case of the said vessel being taken or lost, in the course of the said voyage, no wages should be demanded or received by the persons subscribing the same, except the advance wages received by them respectively, at the time of entry on board; and that if the said vessel should be restrained for more than thirty days at any one time, the wages should cease during such restraint, and no longer. It did not appear, that this particular clause was explained to the seamen, or that they received, on that account, any extra wages. The testator (Mr. Thorndike) had, by sundry policies of insurance, insured the said vessel and her freight for the voyage; and under these policies he received from the underwriters the sum of $2,000, which was accordingly deducted from the amount of the sums awarded by the commissioners to the testator, for the ship and freight (viz. $1,000 from each), and was paid over to the underwriters.

The following reasons of appeal were assigned by the respondent: 1. Because the judge allowed no effect to the stipulation in the shipping articles. 2. Because the judge allowed wages after December 28, 1809, the day of final condemnation. 3. Because the judge allowed wages for a period long after Lull had ceased to be employed in the vessel, and after all hope of restoration and recovery had expired, and until Lull's arrival in the United States. 4. Because no deduction was made of such proportion, as the commissioners refused to allow for the value of the said vessel and freight, on account of sums received by the said Israel Thorndike from underwriters. 5. Because full payment was decreed, notwithstanding the respondents have not received, and may never receive, more than two-thirds of the amount awarded by commissioners.

Franklin Dexter, for respondents and appellants.

J. Hardy Prince and John Pickering, for the libellants.

STORY, Circuit Justice. Some principles, applicable to the present case, are now so clear, that they need only be stated, although at a former time they were subject to many learned doubts. The capture of a neutral ship does not of itself operate as a dissolution of the contract for mariners' wages, but at most, only as a suspension of the contract. If the ship is restored, and performs her voyage, the contract is revived, and the mariner becomes entitled to his wages; that is, to his full wages for the whole voyage, if he has remained on board and done his duty, or if, being taken out, he has been unable, without any fault of his own, to rejoin the ship. If the ship is condemned by a sentence of condemnation, then the contract is dissolved, and the seamen are discharged from any farther duty on board; and they lose their wages, unless there is a subsequent restitution of the property, or of its equivalent value, upon an appeal, or by treaty, with an allowance of freight, in which event their claim for wages revives.

In the case of a restitution in value, the proceeds represent the ship and freight, and are a substitute therefor. If freight is decreed or allowed for the whole voyage, then the mariners are entitled to the full wages for the whole voyage; for the decree for freight, in such a case, includes an allowance of the full wages, and consequently, creates a trust or lien to that extent thereon, for the benefit of the mariners. If the freight decreed or allowed is for a part of the voyage only, the seamen are ordinarily entitled only to wages up to the time, for which the freight is given, unless under special circumstances; as where they have remained by the ship, at the special request of the master, to preserve and protect the property for the benefit of all concerned. These are principles now firmly established in our maritime law; and, indeed, they have scarcely been questioned at the argument. They will be found generally recognised in the learned Commentaries of Mr. Chancellor Kent (volume 3, lect. 46, pp. 191, 192), and discussed at large in the case of The Saratoga [Case No. 12,355]; in Willard v. Dorr [Cases Nos. 17,679 and 17,680]; in Sheppard v. Taylor, 5 Pet. [30 U. S.] 675; in Spafford v. Dodge, 14 Mass. 66; in Beale v. Thompson, 4 East, 546; and in Abb. Shipp. pt. 4, c. 3, § 2, pp. 458–464. and notes.

In the next place, it is ordinarily the right, as well as the duty, of mariners, belonging to a neutral ship, after capture, to remain by the ship, while there is any hope of recovery of the property; and this, generally, although not universally, may be said to be gone, when there is a sentence of condemnation; and a fortiori, when there is a sale thereof pending the proceedings, or under the sentence of condemnation. For this doctrine, also, I may refer to the authorities already cited, and especially to the case of The Saratoga [supra], where many of them are collected and commented on. Now, upon these principles, there cannot be any doubt, that the libellant's intestate, Lull, was entitled, in the events, which have occurred, to wages from the time of his shipment up to the time of the final confiscation of the brig and cargo on the 12th of March, 1810. And here, ordinarily, his wages would stop, unless freight upon the award of indemnity has been allowed by the commissioners for the whole voyage, in which event he would be entitled to wages up to the time of his return to the United States, viz. to the 19th of August. 1810; for such an allowance of freight would include the wages of the master and crew up to that period; and the wages would attach, by way of trust or lien, to that fund.

Then, as to the effect of the stipulation in the shipping articles, which is relied on as controlling the general right of the libellant's intestate to wages. It is well known, that the shipping articles, in their common form, are in perfect coincidence with the general principles of the maritime law as to seamen's wages. It is equally well known, that courts of admiralty are in the habit of watching with scrupulous jealousy every deviation from these principles in the articles, as injurious to the rights of seamen, and founded in an unconscionable inequality of benefits between the parties. Seamen are a class of persons remarkable for their rashness, thoughtlessness and improvidence. They are generally necessitous, ignorant of the nature and extent of their own rights and privileges, and for the most part incapable of duly appreciating their value. They combine, in a singular manner, the apparent anomalies of gallantry, extravagance, profusion in expenditure, indifference to the future, credulity, which is easily won, and confidence, which is readily surprised. Hence it is, that bargains between them and shipowners, the latter being persons of great intelligence and shrewdness in business, are deemed open to much observation and scrutiny; for they involve great inequality of knowledge, of forecast, of power, and of condition. Courts of admiralty on this account are accustomed to consider seamen as peculiarly entitled to their protection; so that they have been, by a somewhat bold figure, often said to be favorites of courts of admiralty. In a just sense they are so, so far as the maintenance of their rights, and the protection of their interests against the effects of the superior skill and shrewdness of masters and owners of ships are concerned. Courts of admiralty are not, by their constitution and jurisdiction, confined to the mere dry and positive rules of the common law. But they act upon the enlarged and liberal jurisprudence of courts of equity; and, in short, so far as their powers extend, they act as courts of equity. Whenever, therefore, any stipulation is found in the shipping articles, which derogates from the general rights and privileges of seamen, courts of admiralty hold it void, as founded upon imposition or an undue advantage taken of their necessities and ignorance, and improvidence, unless two things concur: First, that the nature and operation of the clause is fully and fairly explained to the seamen; and secondly, that an additional compensation is allowed, entirely adequate to the new restrictions and risks imposed upon them thereby. This doctrine was fully expounded by Lord Stowell, in his admirable judgment in the case of The Juliana, 2 Dod. 504; and it was much considered by this court in the case of Harden v. Gordon [Case No. 6,047], and it has received the high sanction of Mr. Chancellor Kent in his Commentaries (volume 3, § 40, p. 193). I know not, indeed, that this doctrine has ever been broken in upon in courts of admiralty, or in courts of equity. The latter courts are accustomed to apply it to classes of cases far more extensive in their reach and operation; to cases of young heirs selling their ex-

pectancies; to cases of reversioners and remainder-men dealing with their estates; and to cases of wards dealing with their guardians; and above all, to cases of seamen dealing with their prize money and other interests. See 1 Story, Eq. §§ 331–340, and the authorities there cited. If courts of law have felt themselves bound down to a more limited exercise of jurisdiction, as it seems from the cases of Appleby v. Dods, 8 East, 300, and Jesse v. Roy, 1 Cromp., M.·& R. 316, 329, 339, that they are, it is not, that they are insensible of the justice and importance of these considerations, but because they are restrained from applying them by the more strict rules of the jurisprudence of the common law, which they are called upon to administer. Tried by the tests above stated, the stipulation in the present articles must be held void; for the onus probandi is on the ship-owner to establish both the knowledge of the seamen of the nature and extent of the operation of the clause; and that a full and adequate compensation therefor was allowed to the seamen. Neither of these facts appears; and the presumption, therefore, is, that neither of them had any actual existence. If it were necessary to discriminate between the two clauses, I should be disposed to construe the first in mitiori sensu, as limited to a final loss of the ship, without restitution or salvage, by capture or other calamity, in the course of the voyage, and not to a mere taking or other loss not followed by such a total destruction of the voyage. But it is unnecessary here to sift its exact purport, because, upon the general considerations already stated, the entire clause may be at once laid out of the case.

The next objection, which has been rather glanced at than pressed upon the appeal, is, that the commissioners did not allow by their award the full compensation claimed by the owner. But it must be taken, that the compensation was a full indemnity for his loss; for such was the duty imposed by law upon the commissioners; and they cannot be presumed to have departed from it. That a larger claim was made, is no proof, that a full indemnity was not allowed. Merchants are not understood to be in the habit of confining claims of this sort to the very minimum of their supposed losses. They are more apt to err, if at all, upon the side of studied exaggeration. The real objection, however, which has been raised under this head is, that the owner has not had awarded to him the full value of the ship and freight; but, that the underwriters upon certain policies of insurance have had awarded to them the sum of $2,000 (being the amount, which they paid to the owner under their policies,) and that therefore the underwriters, and not the owner, are liable pro rata for such a proportion of the wages, as the sums awarded to them bear to the whole value of the ship and freight. Now, the decisive answer to this objection is, that

the seamen have nothing to do with these policies of insurance, or with any rights of the underwriters derived under them. They are strictly res inter alios acta. The right of the underwriters is not an adverse interest; but derivative under the testator by his own voluntary act of cession or assignment, resulting by operation of law from his having received full compensation under the policies. Suppose the testator had assigned his whole interest in the ship and freight, instead of a partial interest, for a valuable consideration; could it be for a moment admitted, that he could thereby change his own responsibility to the seamen, or turn them over for their compensation to mere strangers? Certainly not. It is quite a different question, whether they might not proceed upon their implied trust or lien against the proceeds, in whosesoever hands they could find them. But the ship-owner, by his own voluntary act of cession, cannot discharge himself from his original liability under his contract; for the value of the ship and freight, to whomsoever paid, must be deemed a payment by his consent and for his benefit. The same question was made in the case of Brooks v. Dorr, 2 Mass. 39, and was there disposed of upon reasoning and principles entirely satisfactory.

The next and last objection, which has been made, is, that the respondents have received certain instalments only of the sums awarded under the treaty, and not full payment. It is admitted, that they have received far more than is sufficient to pay all the wages of the seamen, and that is sufficient to dispose of this objection. The wages of seamen attach as a lien to the ship and freight, and their proceeds, into whosesoever hands they may come, as a claim or privilege, having a priority to be satisfied before all other claims. As it has been sometimes expressively said, they are nailed to the last plank of the ship. The ship is a pledge for the payment, while a single fragment remains of the wreck or of its proceeds. See 1 Pet. Adm. 186, note [Relf v. The Maria, Case No. 11,692]; The Neptune, 1 Hagg. Adm. 227; The Sydney Cove, 2 Dod. 13; The Two Catharines [Case No. 14,288].

Upon the whole, my opinion is that the libellant is entitled to maintain her suit, and to recover wages from the time of shipment (4th September, 1809) to the time, when Lull arrived in the United States (the 19th of August, 1810,) that is to say, for eleven and a half months, deducting therefrom one month's advance, to wit, $207, deducting $18, which leaves a balance in her favor of $189; which is the very sum decreed by the district court. That decree is therefore affirmed with costs.

BROWN (LYMAN v.). See Case No. 8,627.
BROWN (McLEAN v.). See Case No. 8,880.
BROWN (MAGILL v.). See Case No. 8,952.