## THE ECLIPSE.

### MARTIAL et al. v. THE ECLIPSE et al.

(District Court, N. D. California. December 14, 1892.)

No. 10,465.

1. SEAMEN—WAGES—PAYMENT IN ADVANCE.

The agent of certain boarding-house masters made an agreement with the owner of the Eclipse to furnish a crew of 12 men for $200, and took from such crew orders on the captain, payable 24 hours after the sailing of the Eclipse on a voyage from San Francisco to a port in British Columbia. The orders, the ostensible object of which was to pay bills due for board and outfit, were drawn in favor of the boarding-house masters, but in every instance the sum named in the order exceeded the indebtedness of the seaman. The orders were paid when due, and the agent received $32 from the boarding-house masters, who kept the balance. At the end of the voyage the owner paid each seaman, deducting the amount of his order, and took a receipt in full. *Held*, that in a court of admiralty the seamen were entitled to be paid their full wages, reduced by the actual sums due for board and outfit instead of by the amount of the orders, notwithstanding the giving of the receipts in full.

2. SAME—CONSTRUCTION OF STATUTE.

Act June 26, 1884, as amended by Act June 19, 1886, forbidding the payment of advance wages to seamen except for certain purposes, and according to allotment made under regulations prescribed by the secretary of the treasury, must be construed as applying to the trade between the western coast and the ports of British Columbia, especially in view of the fact that for more than six years this construction has been adopted by the secretary in the regulations prescribed by him. The State of Maine, 22 Fed. Rep. 734; U. S. v. King, 23 Fed. Rep. 138; and The Samuel E. Spring, 27 Fed. Rep. 764,—distinguished.

In Admiralty. Libel by Thomas Martial, Nils Hansen, Ambrose Pablete, Thomas Hosford, Frank Wallace, George Peterson, Emil Menendez, and William Morris against the ship Eclipse for balance of seamen's wages. Libel dismissed as to libelants Menendez and Morris. Decree for other libelants.

H. W. Hutton, for libelants.
S. Bloom, for claimants.

MORROW, District Judge. This is an action for balance of seamen's wages. The libelants shipped on board the ship Eclipse, at the port of San Francisco, on the 7th day of September, 1892, for a voyage to Port Angeles, in the state of Washington, thence to Nanaimo or Departure bay, in British Columbia, and return; wages, $25 per month. The voyage was completed, and libelants discharged in the port of San Francisco, November 1, 1892. The wages of each seaman for the voyage amounted to $45.83. During the voyage, some of them received small sums of money and a few articles from the slop chest, but the present controversy is with respect to deductions made from the wages on account of certain advance notes or orders given by the libelants before the commencement of the voyage.

It appears that one John Savory, acting for certain boarding-house masters, made an agreement with Andrew Anderson, the managing owner of the vessel, to furnish him with a crew of 12 men for

the voyage, for $175. This agreement Savory failed to keep, but another agreement was made, under which Savory furnished Anderson a crew of 12 men for $200. For the payment of this sum of $200, Savory took from the seamen advance notes or orders upon the captain of the vessel, in favor of the boarding-house masters, payable 24 hours after the sailing of the vessel. Eight of the men shipped gave advance orders in the sum of $15 each, and four gave orders in the sum of $20 each, making the full sum of $200. These advance orders were paid to Savory the day after the vessel sailed, by Anderson, the managing owner, and Savory paid this money to the boarding-house masters, receiving from them $2.50 on each $15 order, and $3 on each $20 order, the boarding-house master retaining the balance. It appears that the boarding-house masters had small bills against the seamen for board, and that they furnished a small outfit at an expense of from $1 to $3 in each case, but in no case did the board and outfit amount to more than $9, and in one case it was less than $3. The ostensible purpose of the advance orders was, therefore, to pay these bills due to the boarding-house masters, but in every instance the sum mentioned in the order exceeded the indebtedness of the seaman giving the order. When Anderson, the managing owner of the vessel, paid the crew in San Francisco at the end of the voyage, he deducted the amount of the advance order, and took a receipt in full in each case, without any objection being made on the part of the seaman. As before stated, Anderson paid the orders the day after the vessel sailed, and of course before the wages to the amount of the order had been earned.

It is now claimed on the part of the libelants—First, that the whole transaction relating to the advance orders was in fraud of their rights, in wrongfully deducting from their wages sums of money in excess of what they should have been required to pay under any circumstances; and, second, that the payment of the orders was the payment of advance wages, and was contrary to the provisions of section 10 of the act of June 26, 1884, (23 St. at Large, 55,) as amended by section 3 of the act of June 19, 1886, (24 St. at Large, 80.) The managing owner of the vessel meets the first claim by saying that he paid the advance orders in full; that it was not for him to inquire whether the seamen who gave them were in debt in the amount stated in the orders; that when he paid the crew their wages they receipted in full, and made no complaint, and did not object to the deductions. The answer to this defense is that the managing owner made a bargain with Savory for a crew of 12 men for $200 after a previous agreement for the same number of men for $175 had failed; in other words, he fixed the advance wages himself, and left it to those who should furnish the men to make whatever they could out of the transaction. We are not surprised, therefore, to find that the amounts received by some of them in board and outfit were very small. The terms of the agreement would naturally lead to that result. The fact that the men receipted in full for their wages after the voyage was over is no answer to such a transaction in a court of admiralty. As was well said in Rosenthal v. The Die Gartenlaube, 5 Fed. Rep. 827, 830:

"A party colluding with a master to cheat the seamen out of a part of their wages, or to induce them to apply their wages in anticipation of payment to any purpose not shown to be for their own good, will receive no relief in a court of admiralty. Of course, after they are paid their wages they can expend the money as they like; but payment in anything else than money, though with their consent, will be most rigidly scrutinized, and must be clearly shown to be proper and equivalent to the payment of the money itself to them."

Courts of admiralty do not "give any effect to the receipt of a sailor for his wages, whether sealed or parol, unless there was an actual payment." See 2 Pars. Shipp. & Adm. 41, and cases cited. There is no difficulty, therefore, in arriving at the conclusion that the libelants are entitled to be paid their full wages, less deductions for actual sums due for board, outfit, and cash received. This right they have without regard to congressional legislation upon the subject of seamen's wages.

But the next question requires an examination of such legislation. The libelants claim that the payment of advance wages is in violation of section 10 of the act of June 26, 1884, as amended by the act of June 19, 1886, which provides that such payments shall be no defense to an action for the full amount of wages. That section provides as follows:

"That it shall be, and is hereby, made unlawful in any case to pay any seaman wages before leaving the port at which such seaman may be engaged, in advance of the time when he has actually earned the same, or to pay such advance wages to any other person, or to pay any person, other than an officer authorized by act of congress to collect fees for such service, any remuneration for the shipment of seamen Any person paying such advance wages or such remuneration shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished by a fine not less than four times the amount of the wages so advanced or remuneration so paid, and may be also imprisoned for a period not exceeding six months, at the discretion of the court. The payment of such advance wages or remuneration shall in no case, except as herein provided, absolve the vessel, or the master or owner thereof, from full payment of wages after the same shall have been actually earned, and shall be no defense to a libel, suit, or action for the recovery of such wages: provided, that this section shall not apply to whaling vessels: and provided, further, that it shall be lawful for any seaman to stipulate in his shipping agreement for an allotment of any portion of the wages which he may earn to his wife, mother, or other relative, or to an original creditor in liquidation of any just debt for board or clothing which he may have contracted prior to engagement, not exceeding ten dollars per month for each month of the time usually required for the voyage for which the seaman has shipped, under such regulations as the secretary of the treasury may prescribe, but no allotment to any other person or corporation shall be lawful; and any person who shall falsely claim such relationship to any seaman in order to obtain wages so allotted shall, for every such offense, be punishable by a fine of not exceeding five hundred dollars, or imprisonment not exceeding six months, at the discretion of the court; and any master, owner, consignee, or agent of any foreign vessel who has violated this section shall be liable to the same penalty that the master, owner, or agent of a vessel of the United States would be for a similar violation."

Under the authority conferred by this section, the secretary of the treasury, by a circular dated June 21, 1886, prescribed regulations for the allotment of wages for certain voyages between ports in the several coasting districts and between domestic and foreign ports, including Atlantic ports in the dominion of Canada, and be-

tween Pacific ports and ports in British Columbia. For this last voyage the secretary fixes the time at one half of a month, and prescribes that the allotment of wages shall not exceed $5. Under date of August 9, 1886, the secretary prescribed additional regulations for the allotment of wages, and declared that the law forbids the payment of advance wages. It will not be necessary to point out the particulars wherein the advance notes or orders in the case at bar fail to meet the requirements of the regulations, since it is not claimed that they were issued or paid in accordance with such regulations, but it is contended that the law does not apply to vessels engaged in the coastwise or British Columbia trade. The case of the State of Maine, 22 Fed. Rep. 734, is cited in support of this view of the law, but all that case decides is that the act is not applicable to the shipment of seamen in a foreign port. The case of U. S. v. King, 23 Fed. Rep. 138, is also cited by the defense. In that case one Wallace kept an employment office in Mobile, where he had blank agreements prepared, to which he secured the signature of the hands whom he engaged for masters of river steamboats. The defendant in the case was the clerk of the steamboat Mary, a vessel navigating the Mobile and Alabama rivers between Mobile and Montgomery. The clerk paid Wallace, for the master of the steamboat, 25 cents for each deck hand or seaman so engaged or employed by Wallace for the vessel. The criminal information filed in the United States circuit court charged the defendant with a violation of section 10 of the act of June 26, 1884. The 25 cents paid to Wallace was not deducted from the seamen's wages, and was not, therefore, advance wages or an allotment of wages, but the charge was that the 25 cents was a remuneration for the shipment of seamen, paid to a person other than an officer authorized by the act of congress to collect fees for such service, and was therefore within the penal clause of section 10. The court held that the provisions of this section did not apply to steamboats engaged in trade and navigating the inland waters of the United States. This conclusion is reach by considering previous acts of congress on this subject. Reference is made to the act of June 7, 1872, providing for the shipment of seamen before a shipping commissioner, and the amendatory acts of January 15, 1873, and June 9, 1874, relieving from the provisions of the first act vessels engaged in the coastwise trade, or in the trade between the United States and British North American possessions or the West India islands or the republic of Mexico; and the court concludes that, had congress intended by section 10 of the act of June 26, 1884, to return to the stringent, and, to some extent, onerous, provisions of the act of June 7, 1872, it would have indicated that purpose more clearly and distinctly than it did in the section under consideration. This conclusion was natural, in applying the particular provisions in controversy to the facts of that case. The declared purpose of congress in enacting these statutes to protect American seamen was not violated. The act of the defendant did not deprive the seamen of any of their rights, or work any injury to their interests. But in the present case the situation is very different. The payment of advance wages to seamen has been one of the great evils of the merchant

marine service. It has been one of the methods employed to defraud the seaman out of a large share of his wages, and, prior to congressional legislation upon the subject, courts of admiralty were continually called upon to interpose their power and authority for the protection of the seamen from this method of imposition. The reports are full of cases declaring in the strongest terms against the many schemes that have been devised to obtain possession of the seamen's wages, even under the form of law. In McCarty v. The City of Bedford, 4 Fed. Rep. 818, Judge Benedict held that wages earned by a seaman in the coastwise trade of the United States were not subject to garnishment; and he based his decision upon principles older than any statute. He said:

"In conclusion, I may add that the rule exempting wages from garnishment springs out of the sharp necessity which the nature of his calling casts upon the seaman when he leaves his ship. A seaman is compelled to be improvident. While at sea the ship is his house, and his daily bread he must receive from the hands of the ship's master. His wages cannot be paid him day by day, but must be allowed to accumulate in the hands of an unknown owner. When the voyage is over he must at once provide himself with temporary shelter and with food, and for that purpose he must have money in his hand. Therefore it is that his wages are nailed to the ship, and therefore it is that, as in the ancient days of the Consolate, so now the law is forced to declare that no man can be permitted to say anything or do anything to deprive the seaman of the right to demand his wages when he leaves the ship."

The purpose of the act of June 7, 1872, was to incorporate this well-established principle of maritime law into a system for the protection of seamen engaged in the merchant marine service of the United States, but it was found in the practical operation of this act that some of its features imposed unnecessary burdens upon vessels engaged in the coastwise trade and in voyages to neighboring ports in contiguous territory, and such vessels were accordingly relieved from its provisions by the acts of January 15, 1873, and June 9, 1874. The act of June 26, 1884, revised the law upon the subject of shipping, and removed certain burdens from American vessels. It also specially provided, in section 10, against the payment of advance wages to seamen in any case, but provided for an allotment of wages with certain limitations. It also provided that the section should not apply to whaling vessels. The law was again revised by the act of June 19, 1886, and further provision made, in section 3 of that act, for the allotment of wages, under such regulations as the secretary of the treasury might prescribe, and the law made applicable to foreign, as well as American, vessels. This is the state of the law at present. The purpose of congress is neither obscure nor uncertain. It clearly intended to prohibit the payment of advance wages in every case, except where the employment is on a whaling vessel. This exception establishes the otherwise general character of the provision, and the court is not at liberty to add any other exception to the statute. The case of The Samuel E. Spring, 27 Fed. Rep. 764, was a libel for wages earned on a voyage from New York to Havana and Matanzas, and thence to Boston. A vessel on this voyage, being engaged in trade with the West India islands, was excepted from the provisions of section 12 of the act of June 7, 1872, by the act of January 15,

1873; but the claim does not appear to have been made, as in the present case, that the vessel was therefore excepted from the provisions of the act of June 26, 1884. The case is, however, interesting in its treatment of the question of advance wages, and in that respect is an authority upon the question now under consideration. The libelants gave evidence that, at the time of their shipment, a verbal agreement, differing from that expressed in the shipping articles, was made by them with the shipping agent, by which the monthly rate of wages was to be greater than that expressed in the shipping articles, and that one month's wages was paid to each man in advance before sailing. The men were to receive, partly in advance and partly at the end of the voyage, the wages verbally agreed upon, and shipping articles were signed, making no provision for advances, but showing a rate of wages which, with the sums advanced, gave the men what they were entitled to have by the verbal agreement. The owners paid, or offered to pay, in accordance with the verbal agreement. Those who were paid gave receipts in full. The second mate was offered his wages, but he refused to accept them, and demanded the amount due him by the verbal agreement without deducting the sum paid him in advance. The suit was, in effect, to recover again the wages paid in advance. The court held that the seamen, having been paid in full in accordance with the terms of their verbal agreement, were not entitled to recover the same wages a second time, and gave effect to their receipts; but it also held that the second mate was entitled to recover his wages according to the verbal contract without deducting the payment made to him in advance. In commenting upon the provision of the statute prohibiting advance wages the court said:

"The rule undoubtedly is that statutes are to receive a reasonable construction, and doubtful words and phrases are to be construed, if possible, so as not to produce mischievous results. But when the words used are plain and unambiguous, there is no room for construction, and nothing is left for the court but to give to them their full effect. The act prohibits, in direct and positive terms, the payment of advance wages to seamen before leaving port, and declares that such payment shall in no case absolve the owner, master, or vessel from full payment of wages, or be a defense to a suit for their recovery, after they are earned. It applies, in terms, to all voyages except whaling voyages. Its prohibition must clearly extend to indirect as well as direct payments. The illegality of the payment was wholly on the side of the owner. It would be absurd, as well as a palpable disregard of the legislative intent, to hold that the law can be evaded by merely having the seamen sign fictitious shipping articles, which do not express the rate of wages actually agreed upon and intended to be paid for the voyage. I am therefore obliged to hold that the second mate can recover his wages according to the verbal contract, without deducting the payment in New York."

It may be further observed, with respect to the cases cited, that they were decided prior to the amendatory act of June 19, 1886. The authority conferred upon the secretary of the treasury, by this amendatory act, to prescribe regulations for the allotment of wages, and his execution of that authority, is entitled to respectful consideration in construing the section as amended, particularly in view of the fact that these regulations have been in force now for more than six years. Under this authority, the secretary has determined that ad-

vance wages are forbidden, and that vessels engaged in the coastwise trade, and in the trade between Atlantic ports and the dominion of Canada, and between Pacific ports and British Columbia, are subject to the statute. This determination cannot be disregarded without the clearest reasons for a contrary view. "In all cases of ambiguity, the contemporaneous construction, not only of the courts, but of the departments, and even of the officials whose duty it is to carry the law into effect, is universally held to be controlling." Schell's Ex'r v. Fauche, 138 U. S. 562–572, 11 Sup. Ct. Rep. 376. See, also, Railway Co. v. Phelps, 137 U. S. 528–536, 11 Sup. Ct. Rep. 168; Merritt v. Cameron, 137 U. S. 542–552, 11 Sup. Ct. Rep. 174. It follows that the payment of the advance notes or orders is no defense to this action, and a decree will accordingly be entered for the libelants, as follows: Thomas Martial, $15; Nils Hansen, $15; Ambrose Pablete, $20; Thomas Hosford, $15; Frank Wallace, $20; George Peterson, $15. The libelants Emil Menendez and William Morris having failed to prove their claims, the libel is dismissed as to them.