# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL ROGERS; HULYA KAR,
individually and on behalf of all
other similarly situated seafarers
and as private attorney general,
        *Plaintiffs-Appellants,*

    v.

ROYAL CARIBBEAN CRUISE LINE;
M/V MONARCH OF THE SEAS,
        *Defendants-Appellees.*

No. 07-55071

D.C. No.
CV-06-04574-SVW

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
May 5, 2008—Pasadena, California

Filed November 6, 2008

Before: John T. Noonan, William A. Fletcher, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge William A. Fletcher;
Dissent by Judge Noonan

15227

**COUNSEL**

Joseph S. Farzam, Law Offices of Joseph F. Farzam & Associates, Los Angeles, California, for the appellants.

Sanford L. Bohrer; Scott D. Ponce, Holland & Knight, Miami, Florida; Paul C. Workman, Holland & Knight, Los Angeles, California, for the appellee.

Jeffrey Robert White, Washington, D.C., David W. Brill, Downs Brill Whitehead, Pembroke Pines, Florida, for amicus curiae American Association for Justice.

Paul Giannini, Law Office of Paul Giannini, Los Angeles, California, for amicus curiae Seafarer Benefit Foundation.

**OPINION**

W. FLETCHER, Circuit Judge:

Michael Rogers and Hulya Kar appeal the district court's order granting their employer's motion to compel arbitration. They argue that federal statutes exempt their employment contracts from the scope of Title 9 of the United States Code. We conclude that their employment contracts are "considered as commercial" under Title 9. Therefore, we hold that the arbitration provisions contained in their employment contracts are enforceable, and we affirm the judgment of the district court.

## I.   Background

Michael Rogers, a citizen of Trinidad and Tobago, and Hulya Kar, a citizen of Turkey, worked on cruise ships operated by Royal Caribbean Cruises Ltd. ("Royal Caribbean").[1] Rogers worked as a "cabin boy" and "stateroom attendant," and Kar worked as an assistant waiter.

Counsel for Rogers and Kar have stipulated that both employees signed a written employment agreement with Royal Caribbean. Kar's employment agreement provided that Royal Caribbean would pay her $50 in "[m]onthly basic pay," and that she was entitled to $890 in "[m]onthly [g]uaranteed [p]ay including [g]uaranteed [o]vertime." According to the employment agreement, "the monthly guaranteed pay is inclusive of all gratuities provided by passengers."

Kar's employment agreement expressly stated: "I . . . understand and agree that the Collective Bargaining Agreement between [Royal Caribbean] and the [Norwegian Seafarers'] Union is incorporated into and made part of this Employment Agreement and that I and the Company are bound by its terms and conditions." In the employment agreement, Kar acknowledged having received a copy of the Collective Bargaining Agreement.

Article 26 of the Collective Bargaining Agreement between Royal Caribbean and the Norwegian Seafarers' Union ("the Union") describes a "Grievance and Dispute Resolution Procedure." Subsection (d) states that if a grievance or other dispute "relating to or in any way connected with the seafarer's service for" Royal Caribbean is "not resolved by the Union, the Owners/Company, and/or the Seafarer," then the dispute

---

[1]Royal Caribbean is unable to identify records for any employee named Michael Rogers. For purposes of this opinion, we assume, without deciding, that Rogers was a Royal Caribbean employee. Rogers has stipulated that he signed an employment agreement incorporating the arbitration clause at issue in this case.

> shall be referred to and resolved exclusively by bind-
> ing arbitration pursuant to the United Nations Con-
> ventions on Recognition and Enforcement of Foreign
> Arbitral Awards (New York 1958), 21 U.S.T. 2517,
> 330 U.N.T.S. ("The Convention") . . . . The arbitra-
> tion referred to in this Article is exclusive and man-
> datory. Claims and lawsuits may not be brought by
> any Seafarer or party hereto, except to enforce arbi-
> tration or a decision of the arbitrator.

On July 21, 2006, Rogers and Kar brought suit against Royal Caribbean in the U.S. District Court for the Central District of California. The complaint alleged that Royal Caribbean had not paid them "their full wages, including tips, overtime and other compensation, owed under their contracts and/or in accordance with applicable general maritime law as well as California law." The complaint further alleged that Royal Caribbean did not pay Rogers and Kar their full wages within twenty-four hours of the end of each voyage, thereby violating 46 U.S.C. § 10313(f).

On October 13, 2006, Royal Caribbean filed a motion to compel arbitration in accordance with the terms of the employment contract and the collective bargaining agreement. In a hearing on December 11, 2006, the district court granted the motion from the bench. On January 25, 2007, the district court issued a written order granting the motion to compel and dismissing the complaint with prejudice. Rogers and Kar timely appealed.

## II.    Standard of Review

We review de novo the district court's order granting the defendant's motion to compel arbitration. *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 981 (9th Cir. 2007); *see also Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1267 (9th Cir. 2006) ("The validity and scope of an arbitra-tion clause are reviewed de novo. Whether a party has waived

the right to sue by agreeing to arbitrate is reviewed de novo."). We also review de novo the district court's interpretation of statutes, as well as its interpretation of treaties to which the United States is a party. *Continental Ins. Co. v. Fed. Express Corp.*, 454 F.3d 951, 954 (9th Cir. 2006); *Holder v. Holder*, 305 F.3d 854, 863 (9th Cir. 2002). "The burden is on the party opposing arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987).

## III.   Discussion

The question in this case is whether the employment agreement's provision for exclusive and mandatory arbitration is enforceable. We hold that it is, and we therefore affirm the judgment of the district court.

### A.   History of Statutory Protections for Seafarers' Wages

Congress first enacted laws to protect the wages of seafaring employees in 1790. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 572-73 (1982). Congress subsequently codified those laws at 46 U.S.C. §§ 596-597. In 1983, Congress altered those statutes slightly and recodified them at 46 U.S.C. § 10313. Act to Revise, Consolidate, and Enact Certain Laws Related to Vessels and Seamen, Pub. L. No. 98-89 ch. 103, 97 Stat. 500 (1983).

As the Supreme Court noted in 1932, "[t]he policy of Congress, as evidenced by its legislation, has been to deal with [seafarers] as a favored class." *Bainbridge v. Merchants' & Miners' Transp. Co.*, 287 U.S. 278, 282 (1932). In *U.S. Bulk Carriers, Inc. v. Arguelles*, the Court observed:

> Seamen from the start were wards of admiralty. In 1872 it was provided that the federal courts might appoint shipping commissioners to superintend the

shipping and discharge of seamen in our merchant fleet. Commissioners indeed served as an administrative adjunct of the federal courts until July 16, 1946, when § 104 of Reorganization Plan No. 3 of 1946 abolished them. No other administrative agency was substituted. The federal courts remained as the guardians of seamen, the agencies chosen by Congress, to enforce their rights — a guardian concept which, so far as wage claims are concerned, is not much different from what it was in the 18th century.

400 U.S. 351, 355 (1971) (citations and internal quotation marks omitted).

**[1]** In *Castillo v. Spiliada Maritime Corp.*, 937 F.2d 240, 243 (5th Cir. 1991), the Fifth Circuit explained the rationale for Congress' decision to afford special statutory status to seafarers and their wage claims:

They enjoy this status because they occupy a unique position. A seaman isolated on a ship on the high seas is often vulnerable to the exploitation of his employer. Moreover, there exists a great inequality in bargaining position between large shipowners and unsophisticated seamen. Shipowners generally control the availability and terms of employment.

To shield shipmen against unfair conduct by shipowners, Congress enacted special wage protection statutes.

Those special wage protection statutes include the provisions now codified at 46 U.S.C. § 10313.

**[2]** Subsection (f) of Section 10313 states that "[a]t the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has

been discharged or within 4 days after the seaman is discharged, whichever is earlier." Subsection (g) states that "[w]hen payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed." Subsection (i) states that "[t]his section applies to a seaman on a foreign vessel when in a harbor of the United States. The courts are available to the seaman for the enforcement of this section."

**[3]** In interpreting an earlier version of these statutes, the Supreme Court explained the purpose of the provision making the courts "available to the seaman for the enforcement" of the wage provisions (now 46 U.S.C. § 10313(i)):

> The language applies to all seamen on vessels of the United States, and the second proviso of the section as it now reads makes it applicable to seamen on foreign vessels while in harbors of the United States. The proviso does not stop there, for it contains the express provision that the courts of the United States shall be open to seamen on foreign vessels for its enforcement. The latter provision is of the utmost importance in determining the proper construction of this section of the act. It manifests the purpose of Congress to give the benefit of the act to seamen on foreign vessels, and to open the doors of the federal courts to foreign seamen. No such provision was necessary as to American seamen for they had the right independently of this statute to seek redress in the courts of the United States, and if it were the intention of Congress to limit the provision of the act to American seamen, this feature would have been wholly superfluous.

*Strathearn S.S. Co. v. Dillon*, 252 U.S. 348, 354 (1920).

## B.    Codification of the Arbitration Convention

Federal arbitration law is codified in the three chapters of Title 9 of the United States Code. The Federal Arbitration Act ("FAA"), enacted in 1947, comprises the first chapter. *See* 9 U.S.C. §§ 1-14. The "Convention on the Recognition and Enforcement of Foreign Arbitral Awards," implementing the treaty of the same name, was enacted in 1970. This statute, commonly called the Convention Act, comprises the second chapter. *See* 9 U.S.C. §§ 201-208. The third chapter, implementing the Inter American Convention on International Commercial Arbitration, is not relevant to this case. *See* 9 U.S.C. §§ 301-307.

[4] Section 1 of the FAA includes a special carve-out for "contracts of employment of seamen." 9 U.S.C. § 1. Section 1 is entitled " 'Maritime transactions' and 'commerce' defined; exceptions to operation of title." It states:

> "Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, *but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.*

9 U.S.C. § 1 (emphasis added).

**[5]** For purposes of our analysis, we refer to the italicized language in Section 1 as the "exemption clause." *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 112 (2001). The Supreme Court has interpreted the language of the exemption clause narrowly. In *Circuit City Stores, Inc. v. Adams*, the Court held that the Section 1 exemption from the FAA extends only to "contracts of employment of transportation workers." 532 U.S. at 119.

The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention") entered into force for the United States on December 29, 1970. Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("New York Convention"). Article II(1) of the Convention provides that "[e]ach Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration." Paragraph 3 of Article I of the Convention allows — but does not require — a Contracting State to "declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are *considered as commercial* under the national law of the State making such declaration." *Id.* art. I(3) (emphasis added).

**[6]** In accordance with Paragraph 3, the United States declared in the Convention Act that it would apply the Convention only to "legal relationships . . . considered as commercial." Section 202 of the Convention Act provides that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention." 9 U.S.C. § 202. Section 2 of the FAA, referenced in Section 202, provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

[7] Section 206 of the Convention Act states that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206. The Convention Act includes a general provision incorporating the FAA. Section 208 of the Act states that "Chapter 1 [of the FAA] applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States." 9 U.S.C. § 208.

## C.   Analysis

### 1.   The Exemption Clause of the FAA

We must decide whether the exemption clause in Section 1 of the FAA applies to arbitration agreements that would, in the absence of the exemption clause, be covered by the Convention Act. We hold that it does not.

As noted above, the Convention Act applies to arbitration agreements arising out of legal relationships that are "considered as commercial." 9 U.S.C. § 202. The Convention Act states that such agreements include, but are not limited to, agreements described in Section 2 of the FAA. Section 2

describes provisions in contracts "evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract." 9 U.S.C. § 2. The Supreme Court has concluded that contracts "evidencing a transaction involving . . . commerce" include employment contracts. *Circuit City Stores*, 532 U.S. at 113.

**[8]** The Supreme Court considered the scope of Section 2 in *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995). The Court had previously concluded that the FAA preempts state law, and in *Allied-Bruce* it considered the breadth of the FAA's reach, as set forth in Section 2. *Id.* at 272-73. The Court examined the phrase "a contract evidencing a transaction involving commerce" in two steps. First, the Court noted that the words " 'involving commerce' . . . are broader than the often-found words of art 'in commerce.' " *Id.* at 273. The Court held that the phrase "involving commerce" is "the functional equivalent of" the phrase "affecting commerce," which "normally signals Congress' intent to exercise its Commerce Clause powers to the full." *Id.* at 273-74. Second, the Court considered the language "evidencing a transaction" involving commerce. *Id.* at 277. The Court read this phrase broadly, holding that the transaction must involve interstate commerce, but that the parties to the transaction need not have contemplated that the transaction had an interstate commerce connection. *Id.* at 281.

The Court noted in passing in *Allied-Bruce* that Section 1 of the FAA "defin[ed] the word 'commerce' in the language of the Commerce Clause itself." 513 U.S. at 274; *see* 9 U.S.C. § 1 (" '[C]ommerce', as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation[.]"). The Court made no reference to the exemption clause when it noted the definition of commerce in Section 1.

**[9]** The exemption clause in Section 1 is neither part of the definition of commerce in Section 1, nor a limitation on which relationships are "considered as commercial" pursuant to Section 2. Rather, it operates as an exemption. In other words, the exemption clause does not state that transportation workers are *not* engaged in commerce or that their employment contracts are not "considered as commercial." Instead, it states that *even though* such workers are engaged in commerce and *even though* their employment contracts are considered as commercial, the FAA does not apply to them.

**[10]** Because the exemption clause does not affect the definition of "commerce" or the statutory description of which relationships are "considered as commercial," the exemption is not incorporated into the Convention Act by virtue of Section 202. The only limitation placed on the scope of the Convention Act, other than the language of the Convention itself, is the limitation in Section 202 that "[a]n arbitration agreement . . . arising out of a legal relationship . . . which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the convention." 9 U.S.C. § 202. The employment contracts of seafarers "aris[e] out of legal relationship[s] . . . which [are] considered as commercial," and therefore those contracts "fall[ ] under the [C]onvention."

**[11]** The exemption clause is also not incorporated into the Convention Act by Section 208. That section incorporates the provisions of the FAA unless they are "in conflict with" either the Convention Act or the Convention. *See* 9 U.S.C. § 208 ("Chapter 1 [*i.e.*, the FAA] applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States."). The only mechanism the Convention provides for limiting applicability of the Convention is the opportunity for Contracting States to declare that the Convention applies "only to differences arising out of legal relationships . . . which are considered as commercial under the national

law of the State making such declaration." New York Convention art. I(3). Congress' declaration to that effect, as codified in Section 202 of the Convention Act, did not include the exemption clause. The Convention Act does not allow the exemption clause to operate as an additional limitation, over and above Section 202, on the applicability of the Convention. Nor, indeed, does the exemption clause purport to be such an additional limitation, for it does not narrow the definition of "commercial." Rather, as emphasized above, the exemption clause specifies that the FAA does not apply to contracts within the scope of the clause even though such contracts are commercial.

### 2.    46 U.S.C. § 10313

**[12]** Rogers and Kar argue that *U.S. Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351 (1971), prohibits arbitration agreements from divesting courts of jurisdiction over seafarer wage disputes brought under 46 U.S.C. § 10313. Section 10313 contains various provisions guaranteeing wages to seafarers. Section 10313(i) specifically provides that "[t]he courts are available to the seamen for enforcement of this section." The Fifth and Eleventh Circuits have previously held, as we do today, that the exemption clause of Section 1 does not apply to the Convention Act, but those cases did not involve claims for lost wages under Section 10313. *See Bautista v. Star Cruises*, 396 F.3d 1289, 1298-1300 (11th Cir. 2005); *Francisco v. Stolt Achievement MT*, 293 F.3d 270, 274-76 (5th Cir. 2002). However, in *Lobo v. Celebrity Cruises, Inc.*, 488 F.3d 891, 896 (11th Cir. 2007), the Eleventh Circuit has recently extended its holding in *Bautista* to a claim for lost wages under Section 10313. *Id.* at 896. We join the Eleventh Circuit in concluding that the Convention Act overcomes any presumption deriving from Section 10313(i) that the courts shall remain open to foreign seafarers in a case in which a seafarer

has signed an otherwise enforceable agreement to arbitrate a wage claim.[2]

We do not believe that the Supreme Court's decision in *Arguelles* requires us to hold otherwise. In *Arguelles*, the Court considered whether Section 301 of the Labor Management Relations Act ("LMRA") abrogated the federal court jurisdiction authorized by the predecessor to 46 U.S.C. § 10313. The Court held that it did not. The Court's decision was published just weeks after the Convention entered into force in the United States, and there is no indication that the Court considered the effect of the Convention on Section 10313. Nonetheless, the Court's analysis is instructive.

Section 301 of the LMRA provides that federal courts have subject matter jurisdiction over "actions and proceedings by or against labor organizations." 29 U.S.C. § 185(c). It further provides that "[s]uits for violation of contracts between an employer and a labor organization . . . or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." *Id.* § 185(a). The question before the Court was whether an arbitration provision in a collective bargaining agreement took precedence over the predecessor to Section 10313.

---

[2]Section 10317 renders void any stipulation in an agreement purporting to deprive a seafarer of a remedy to which the seafarer otherwise would be entitled. 46 U.S.C. § 10317 ("A . . . seaman by any agreement . . . may not . . . be deprived of a remedy to which the . . . seaman otherwise would be entitled for the recovery of wages. A stipulation in an agreement inconsistent with this chapter . . . is void."). Because Rogers and Kar have not been deprived of any statutory remedy, we do not reach the question of whether Article V(1)(a) of the Convention would allow our courts to refuse to recognize and enforce an arbitral award effectuating such a deprivation. *See* New York Convention art. V(1)(a) ("Recognition and enforcement of the [arbitral] award may be refused . . . if . . . the said agreement is not valid under the law to which the parties have subjected it[.]").

Despite the fact that the Court had previously held that Section 301 of the LMRA gave it the authority to develop a federal common law of collective bargaining agreements, *see Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957), the Court in *Arguelles* deferred to Congress' statutory resolution of the question. After observing that federal courts remain "the guardians of seamen," particularly with respect to wage claims, the Court wrote that it could "find no suggestion in the legislative history of the Labor Management Relations Act of 1947 that grievance procedures and arbitration were to take the place of the old shipping commissioners or to assume part or all of the roles served by the federal courts protective of the rights of seamen since 1790." *Arguelles*, 400 U.S. at 355-56. The Court wrote:

> We do not hold that [Section 10313] is the exclusive remedy of the seaman. He may, if he chooses, use the processes of grievance and arbitration. Yet, unlike Congress, we are not in a position to say that his interest usually will be best served through § 301 rather than through [Section 10313].

> The literal conflict between this ancient seaman's statute and the relatively new grievance procedure is one which we think Congress rather than this Court should resolve. We do not sit as a legislative committee of revision. We know that this employee has a justiciable claim. We know it is the kind of claim that is grist for the judicial mill. We know that in [Section 10313] Congress allowed it to be recoverable when made to a court. We know that this District Court has the case properly before it under the head of maritime jurisdiction. We hesitate to route this claimant through the relatively new administrative remedy of the collective agreement and shut the courthouse door on him when Congress, since 1790, has said that it is open to members of his class.

. . .

The chronology of the two statutes — [Section 10313] and § 301 — makes clear that the judicial remedy was made explicit in [Section 10313] and was not clearly taken away by § 301. What Congress has plainly granted we hesitate to deny. Since the history of § 301 is silent on the abrogation of existing statutory remedies of seamen in the maritime field, we construe it to provide only an optional remedy to them. We would require *much more* to hold that § 301 reflects a philosophy of legal compulsion that overrides the explicit judicial remedy provided by 46 U.S.C. [§ 10313].

*Id.* at 356-58 (emphasis added).

As the Eleventh Circuit concluded in *Lobo*, Congress has provided "much more" in the text of the Convention Act than it provided in Section 301 of the LMRA. 488 F.3d at 895. As that court explained:

The Court's rationale [in *Arguelles*] was clear: the LMRA simply addressed restrictions on the activities of labor unions; since the history of the LMRA "is silent on the abrogation of existing statutory remedies of seamen in the maritime field, we construe it to provide only an optional remedy to them." [400 U.S.] at 357. The Court concluded that it "would require much more to hold that § 301 reflects a philosophy of legal compulsion that overrides the explicit judicial remedy provided by 46 U.S.C. § [10313]." *Id.* at 357-58.

In contrast, in ratifying the Convention, Congress explicitly agreed to "recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen

> . . . between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration." Convention, Article II(1). Indeed, the Convention *compels* federal courts to direct qualifying disputes to arbitration, while the Supreme Court found the LMRA to be silent on this matter.

*Lobo*, 488 F.3d at 895.

**[13]** We agree with the analysis of the Eleventh Circuit. The Convention Act specifically and expressly compels federal courts to enforce arbitration agreements. Therefore, *Arguelles* does not alter our conclusion that the exemption clause does not apply to the Convention Act.

### 3.    The Arbitration Provisions are Enforceable Under the Convention

The Convention allows a party to avoid arbitration if the agreement to arbitrate is "null and void." New York Convention art. II(3). Rogers and Kar argue that even if the exemption clause does not apply to the Convention Act, and even if the Convention Act applies to seafarers' wage claims despite Section 10313, the arbitration provisions in the Collective Bargaining Agreement are unenforceable under the Convention because they are unconscionable and contrary to public policy. We address these arguments in turn.

#### a.    Unconscionability

**[14]** Even assuming that unconscionability renders an agreement "null and void" under the Convention, *see Bautista*, 396 F.3d at 1301, Rogers and Kar have not carried their burden of establishing that the arbitration clause at issue in this case is unconscionable. *See Paulson v. Dean Witter Reynolds, Inc.*, 905 F.2d 1251, 1255 (9th Cir. 1990). The Collective Bargaining Agreement provides that the agreement is

governed by "the laws of the State of Florida, United States of America." Florida law recognizes "a two-pronged approach" to unconscionability: procedural unconscionability and substantive unconscionability. *Belcher v. Kier*, 558 So. 2d 1039, 1040 (Fla. Dist. Ct. App. 1990). Procedural unconscionability is present where one party to an agreement has no meaningful choice but to accept the agreement. *See id.* at 1042. Substantive unconscionability is present where the terms of the agreement are not merely unreasonable, but shock the judicial conscience. *Id.* at 1043-44.

Rogers and Kar have not met their burden of establishing procedural unconscionability. The Collective Bargaining Agreement, including the arbitration provision, was the product of negotiations between Royal Caribbean and the union that represents Rogers and Kar. Rogers and Kar have presented no evidence that their union lacked any meaningful choice but to accept the arbitration provision. They have also presented no evidence that they themselves lacked any meaningful choice but to accept the employment agreement that incorporated the Collective Bargaining Agreement.

Rogers and Kar have not met their burden of establishing substantive unconscionability. First, they argue that the arbitration provision does not allow the employees to participate in selecting the arbitrators. However, the Union participates in the selection process and can represent the interests of its members. Second, they argue that the arbitration provisions are substantively unconscionable because they require employees to travel to "distant fora" to resolve their disputes. However, the default location for arbitration is the country of citizenship of the employee. Rogers and Kar have not shown that either term is substantively unconscionable.

### b. Contrary to Public Policy

**[15]** Rogers and Kar further argue that the arbitration provision is invalid because it is contrary to public policy and

therefore null and void. *See* New York Convention art. II(3). They argue that because seafarers are "wards of admiralty," *Arguelles*, 400 U.S. at 355, public policy requires that the courts remain open to seafarers for the enforcement of their wage claims. This argument is insufficient to warrant rendering the arbitration provisions void. Congress has expressly directed courts to ensure that arbitration agreements are enforced. 9 U.S.C. §§ 3, 206. The Supreme Court has recognized "the emphatic federal policy in favor of arbitral dispute resolution," a policy which "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). We have recognized "the strong public policy favoring arbitration," including international arbitration. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 726 (9th Cir. 2007); *Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 770 (9th Cir. 1992). Rogers and Kar have not shown that any public policy favoring seafarers is sufficient to overcome the public policy favoring international arbitration, particularly in the absence of any evidence that international arbitration would nullify any of the statutory rights Congress has conferred on seafarers.

## IV.   Conclusion

For the foregoing reasons, we conclude that the arbitration agreement between Royal Caribbean and the Norwegian Seafarers' Union is enforceable under the Convention.

AFFIRMED.

---

NOONAN, Circuit Judge, dissenting:

Among the statutes enacted by the First Congress was the Act of July 20, 1790 establishing a seaman's right to the prompt payment of his wages and a remedy for this right in

federal court. 1 Stat. 133. No other class of contracts was so marked off. No other class of potential plaintiffs was provided with a timetable in terms of which the debt owed them had to be paid.

Seamen's wages were bound by law to the ship the seamen sailed. A lien on the vessel for their payment was "so sacred" that "it adheres to the last plank of the ship." *Sheppard v. Taylor*, 30 U.S. 675, 710 (1831) (per Story, J.). The connection of ship and wages due was such that it could be said that a seaman's wages "are nailed to the ship." *The Eclipse*, 58 F. 273, 277 (N.D. Cal. 1892).

This extraordinary solicitude for seamen — this linkage of seamen and ship and federal supervision — was not the product of a romantic vision of life at sea, but came from a grasp of its grim realities: the resources, social status, and bargaining position of the vessel owner set over against the paltry options of the individual seaman. Together with that appreciation of the seaman's lot went a sense of the importance of a merchant marine and its sailors to the economy of the nation and to its defense. The classic expression of the convergence of all these interests in federal solicitude for the seaman is the opinion of Justice Story, a native of the port of Salem, as he sat on circuit in Maine. *Harden v. Gordon*, 11 F. Cas. 480 (C.C.D. Me. 1823). The continuing strength of this convergence was confirmed by the Supreme Court's citation and quotation of *Harden* in *Vaughn v. Atkinson*, 369 U.S. 527, 531 (1962).

In time the protection of federal law was extended by statute to foreign seamen whose ships were in American ports. *Strathearn S.S. Co. v. Dillon*, 252 U.S. 348, 354 (1920). The extension was undoubtedly designed to prevent American seamen, who could sue, from being replaced by those who could not. *Id.* at 355-56. The statute is of special relevance here where the plaintiffs are foreigners and where counsel for

Royal Caribbean acknowledge in their brief that many of its employees are foreigners.

Even with the significant change in bargaining power brought about by the National Labor Relations Act of 1937, the seaman's right to sue directly for his wages was prized by individual seamen and upheld by the Supreme Court. *U.S. Bulk Carrier, Inc. v. Arguelles*, 401 U.S. 351 (1971). Deciding *Arguelles*, the Supreme Court noted that the explicit remedy permitting the seamen's suit was "not clearly taken away" by the National Labor Relations Act. *Id*. at 357. The Court added: "What Congress has plainly granted we hesitate to deny." *Id*. And the Court did not deny it. This precedent speaks powerfully in the case at bar.

Federal solicitude for the seaman is today embodied in 46 U.S.C. § 10313, simply entitled "Wages." The statute begins by specifying when a seaman's "entitlement to wages and provisions" begins. The statute provides that wages "are not dependent on the earning of freight by the vessel." The statute provides for payment to a seaman before the beginning of the voyage and for non-payment if refusing to work. Near the center of the statute is this provision: "After the beginning of the voyage, a seaman is entitled to receive from the master on demand one-half of the balance of wages earned and unpaid at each port at which the vessel loads or delivers cargo during the voyage." At the end of a voyage the master must pay the balance of wages due within 24 hours after the voyage ends. The master or owner is liable for 2 days wages for each day payment is delayed. Exclusions and inclusions within the statute are spelled out. Excluded from some provisions are fishing and whaling vessels and yachts. Included are seamen "on a foreign vessel when in a harbor of the United States."

This last provision must be considered in relation to what Chapter 103 — Foreign and Intercoastal Voyages embraces. The introductory language reads: "Except as otherwise specifically provided, this chapter applies to a vessel of the United

States on a voyage between a port in the United States and a port in a foreign country (except a port in Canada, Mexico, or the West Indies)." If this portion of Chapter 103, which is entitled "Application," confines the chapter to U.S. vessels and requires that the voyage be between the United States and the non-excluded parts of the world, then the Wage Act has no application here. But the Wage Act specifically provides that it applies to seamen "on a foreign vessel when in a harbor of the United States." No requirement that the vessel be American. No requirement that the vessel's voyage have a particular international destination. It appears that the particular controls the general and that the statute protects foreign seamen in an American port. This reading is confirmed by a broad grant of jurisdiction that concludes the statute: "The courts are available to the seaman for enforcement of this section."

The provisions of Chapter 103 of Title 46 should be read in harmony with a second statute simply denominated "Seamen's suits." It reads as follows: "In all courts of the United States, seamen may institute and prosecute suits and appeals in their own names and for their own benefit for wages or salvage or the enforcement of laws enacted for their health and safety without prepaying fees or costs or furnishing security therefor." 28 U.S.C. § 1916.

As set out in the current U.S. Code, the Wages Act incorporates amendments made in 1983 and in 1986. Neither it nor the Seaman's suits Act have been repealed. They contain no reference to federal law on arbitration. The careful exclusions of the Wages Act do not mention the subject. It is nonetheless the contention of Royal Caribbean that both statutes have been substantially repealed as to foreign seamen. Let us examine the basis for this remarkable contention.

The first step in Royal Caribbean's case is page 1 of a fax of a printed form entitled Sign-On Agreement dated November 1, 2005. Its first part provides the make of the ship, the

M/V Monarch of the Seas and the name of Hulya Kar, her age, and her residence is Istanbul, Turkey. The second part identifies her job: "Assistant Waiter," the portion of her "basic pay payable by the company:" $50; her monthly overtime rate: $3.98; her monthly vacation pay: 0; her daily sick wage rate: $15.30; and her monthly guaranteed pay: $890, specified to be "inclusive of all gratuities provided by passengers."

The form then states in the first person an acknowledgment that the employer may terminate the agreement on 7 days notice. It continues: "I further understand and agree that the Collective Bargaining Agreement between the Company and the Union is incorporated into and made part of this Employment Agreement and that I and the Company are bound by its terms and conditions."

The document is signed by the employee. In a new paragraph on the same page appears the following: "I acknowledge having received copies of (1) the Collective Bargaining Agreement referred to above effective on the date of this Employment Agreement; (2) The Employee Handbook." The signature line under this statement is for the signature of the "Payroll Purser" and is apparently so signed and dated by him.

A Collective Bargaining Agreement (CBA) between Royal Caribbean and the Norwegian Seafarers Union is included in the excerpt of record. It occupies 24 pages. Its signature on behalf of the company is dated August 23, 2005 but Article 28 provides that it "is effective from January 1, 2005."

Article 26 of the CBA is entitled "Grievance and Dispute Resolution Procedure." Section (b) of this article states what is to happen "if the dispute is one involving the amount of wages paid to the Seafarer." On receiving notice of "a grievance" in this regard, the Employer has the right within 60 days to either pay the amount claimed or to deposit it in an

interest-bearing account. If the legal resolution of the grievance is in favor of the employee, he receives no more than the sum deposited by the Company plus the accrued interest. Section (d) of Article 26 provides the procedure for the resolution of "all grievances and any dispute whatsoever." It is to be "by binding arbitration pursuant to the United Nations Convention."

The drift of Royal Caribbean's argument is now evident: By signing on to the form, Kar agreed to arbitrate as the CBA provided, and the CBA provides no place for an action in a federal court. By contract Kar has no choice but to arbitrate.

What's wrong with this argument? It assumes that the rights conferred on seaman by U.S.C. § 10313 may be waived by contract. The assumption runs counter to general maritime law. Again, Justice Story is a good guide: Bargains between shipowners and seaman are scrutinized "with scrupulous jealousy" by courts of admiralty. *Brown v. Lull*, 4 F. Cas. 407, 409 (D. Mass. 1936). Any stipulation in the shipping articles derogating from the seaman's rights is void unless the clause was "fully and fairly explained to the seamen" and they were compensated for the waiver. *Id*. This approach has prevailed: "The analogy suggested by Justice Story between seamen's contracts and those of fiduciaries and beneficiaries remains, under the prevailing rule treating seamen as wards of admiralty, a close one." *Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 247 (1942). The shipowner who relies on a seaman's release of his rights must show "that it was executed freely, without deception or coercion and that it was made by the seaman with full understanding of his rights." *Id*. at 248.

In our case, Kar has stipulated that she signed the Sign-On Agreement which incorporated the CBA. She has not stipulated that she saw the CBA, read it, or understood it, or that her attention was drawn to the federal rights she was waiving. The most we have from the Sign-On Agreement is that "copies" of the CBA were received by someone, apparently the

purser. In the absence of any stipulation or other evidence, the incorporation of the arbitration clause into the Sign-On Agreement was void.

Royal Caribbean attempts to avoid this conclusion by this line of argument: The Convention, admittedly not self-executing, has been enacted into federal law by 9 U.S.C. § 202. This statute commands the federal courts to enforce all international agreements to arbitrate, no exceptions admitted. It is Royal Caribbean's position that it is this statute, not Kar's Sign-On Agreement that puts a dent or, rather, a hole in 46 U.S.C. § 10313's set of rights and remedies.

This contention is a slight of hand. The statute enforcing the Convention comes into play only if there is a valid agreement to arbitrate. We have already determined that no such agreement exists. The international arbitration statute has not been set in motion.

And even if it were, what rule of construction would tell us that the statute, enacted in 1971, trumps a statute that long preceded it and was amended and codified in the 1980's? To suppose that Congress in 1971 meant to repudiate a role for federal courts that went back to 1790 — and did so without a single explicit word — is to engage in unlikely fantasy. To suppose that Congress in the 1980's kept alive a statute expressly opening the federal courts to foreign seamen when the alleged sense of the 1971 statute mandated arbitration in their place is to credit Congress with absentmindedness and to fail to acknowledge the later statute as the governing statute. *Frost v. Weine*, 157 U.S. 46, 57 (1895) (per Harlan, J.).

In *Arguelles*, a new and powerful national policy, collective bargaining, was urged to have led to legislation making obsolete and defunct the seaman's direct remedy in federal court. In our case a new and powerful national policy in favor of international arbitration is urged to reach the same result. But neither the National Labor Management Relations Act nor the

Convention addressed the seaman's statutory rights. No more than the Court in the *Arguelles* case should we do what Congress did not do and proclaim the elimination of the statutory remedy for foreign seamen. Congress has chosen to set in place two routes for the seaman, including the foreign seaman. He or she may arbitrate or he or she may proceed without paying costs to sue in a federal district court.